Commonwealth, Appellant, *v.* Eperjesi.

456

Argued October 4, 1966. Before BELL, C.J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*William J. Franks,* Assistant District Attorney,
with him *John R. Hoye,* District Attorney, for Com-
monwealth, appellant.

*Peter U. Hook,* with him *Joseph E. Kovach,* for
appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 23,
1966:

On July 17, 1965, two small boys, Carl J. Marucci,
7, and Florian Eperjesi, 10, were found dead in a re-
frigerator in the basement below the two-floor apart-
ment occupied by two women, Mary and Wilma Eper-
jesi, in the village of Republic, Redstone Township,
Fayette County. Florian was the grandson of Mary
and the nephew of Wilma. Carl Marucci was Florian's
playmate.

The following day Wilma Eperjesi, 38 years of age,
was taken into custody by the police as a material

witness. She was given a lie-detector test which produced answers which absolved her from any association with the fatal affair of the refrigerator. In view of what followed, it would seem that the lie-detector machine, technically called a polygraph, failed to measure up to the claims advanced for it by its sellers, proponents and champions. Wilma was released from custody and she returned to the normal routine of her living with Mary Eperjesi.

Two days later, on July 20, 1965, John K. Kaminsky, a police officer in Redstone Township, visited the Eperjesi apartment to continue with his investigation into the tragic death of the youngsters, seeking to ascertain what set of circumstances had brought about their untimely end. Were those circumstances purely accidental or had some malevolent hand guided them?

While in the Eperjesi apartment, Wilma Eperjesi, who knew Kaminsky well and regarded him as a friend of the family, called him into a room, locked the door and told him that she was the one who had closed the door of the refrigerator in which the two boys perished.

Subsequently testifying to this disclosure, Kaminsky said: "She called me in the room and locked the door with a key and she says 'Sit down', and there was a chair here and there was another chair. She sat down beside me and grabbed both of my hands and said 'Johnny, I want to tell you what happened.' I just listened to her. She said she went to feed the peepies, saw the refrigerator door open, and slammed it shut. I said 'Why did you do it?' She says 'I don't know why I done it.' "

The "peepies" referred to were little chickens in the basement.

When Kaminsky was asked whether Wilma said anything about knowing the children were in the re-

frigerator, he replied: "First she said she didn't know; then about a few minutes later she says 'Well, I might as well tell you the truth; I knew they were in there.' Q. In the refrigerator? A. Frigidaire, she said. She didn't say refrigerator, she said Frigidaire. Q. Now was that in the presence of the State Police or in your presence? A. Just her and I alone."

Later in the day Wilma was taken to the office of Justice of the Peace Nicholas Zoretic in Republic where her utterances were tape recorded. At this hearing, with several people present, including her brother and sister-in-law, State Trooper Tamallo asked Wilma if she was willing to speak and when she replied in the affirmative, the following ensued: "Q. Now, Wilma, before making this statement, I want to advise you that you are entitled to an attorney or any legal counsel to represent you before you make this statement. You understand what I mean? A. Yeah, I know. Q. Do you want an attorney or legal counsel? A. Yes. . . . Q. O.K. You will make a statement after we get you an attorney. A. Yes."

Then Chief Detective Maggioncalda questioned her: "Q. We understand that you want an attorney to represent you. Would you care to tell us what happened last Saturday night now, before an attorney talked to you, or are you going to wait until an attorney comes? A. I want to talk now. Q. You want to talk now? A. Yes. Q. All right, then go ahead and tell us exactly what happened on Saturday night. Q. Well, see, I'm gonna tell you the truth . . ."

On July 22, 1965, Trooper Tomallo with Detective Maggioncalda called on the defendant in the county jail. Maggioncalda testified that he told Wilma "that she didn't have to tell us anything." He said that he was questioning her to find out, provided she wanted to speak, the exact time she said she closed the fatal door of the refrigerator. She replied that it was 6

o'clock. Maggioncalda then told her that counsel was being appointed for her and that she didn't have to talk if she didn't desire to do so, but there were some questions he wanted to "clear up," and, according to Maggioncalda, "she agreed to answer them." At this questioning, according to Trooper Tomallo, who was with Maggioncalda, Wilma admitted that she knew the boys were in the refrigerator when she closed the door.

We will refer to the statements made by Wilma as (1) the oral declaration in her home to John Kaminsky; (2) the statement made into a tape recording machine at the office of the Justice of the Peace; (3) the oral statement in jail to Tomallo and Maggioncalda.

On December 6, 1965, in pursuance of a petition to suppress confessions filed by Wilma's attorneys, the court conducted a hearing and ordered all of Wilma's statements suppressed. The Commonwealth argues that the court erred in doing so.

We are satisfied that, in the light of the circumstances fully developed at the hearing in court, the court erred in suppressing Statement No. 1. The learned court, in nullifying that statement as evidence, said that when Wilma told Kaminsky she had closed the refrigerator door, it was his "duty and responsibility" to advise her "of her right to remain silent and her right to counsel." There is nothing in the Federal or Pennsylvania decisions which require police, upon hearing a volunteered statement by anyone, to order the volunteer to cease talking.

In the case of *Miranda v. Arizona*, 384 U.S. 436, one of the most recent freshets pouring into the stream of criminal law on the subject of individual rights as against police investigation, the Supreme Court of the United States specifically stated: "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime,

or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding."

The circumstances in this case do not reach the environs of a police station where, even there, the police are not compelled to plug their ears when conscience bursts into the doors and the conscience-bearer bares red hands of guilt. Confession No. 1 in this case occurred in a private home. The conversation which encompassed it was initiated by the volunteer, not by the policeman. The processes of the law had not reached the accusatory stage. Indeed, Wilma had already been excluded as a suspect because of the negative results of the lie-detector test. She had been released without bail. She was at home, as free as any other citizen in Republic.

The police did not call at the Eperjesi home with any plan or thought of harassing Wilma. As already stated above, there was always the possibility that the refrigerator door had closed on the two young lads accidentally. The newspapers often carry stories on such anguishing events. Kaminsky testified: "We were checking the refrigerator to see how much pressure it would take to close the door."

The Court below said: "When she invited him into a room in her home at which time she allegedly told him she had closed the refrigerator door, he knew or should have known that if he continued this examination he might well elicit an incriminating statement."

The court reads into the transcript what is not there. Kaminsky was not "continuing" an "examination." He had not even begun an examination. It was Wilma who called Kaminsky into the room, and, without preliminaries, seized both his hands, and declared she wanted to tell him what had happened. Kaminsky

listened. What was he to do? Run out of the room? Was he to clamp his hands over Wilma's mouth? He listened. He would have been a poor guardian of the peace and security of the community if, while conducting an investigation, he would refuse to listen to a person who was at the scene of the event he was investigating.

Of course, a statement that is coerced or is obtained through deceit is of no more value than a confession written by a hand forced over the paper by the iron grip of a captor. But a confession that is freely given, in every possible sense of the word, is not to be discarded through a reading into appellate decisions what is not there. The Supreme Court of the United States specifically stated in the *Miranda* case, supra, that: "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."

Once an utterance falls from the lips with extemporaneous naturalness, there is no way to declare it non-existent. To order the nullification of such a statement would be like ordering one to re-attach an apple to the limb from which it has fallen, not because of limb shaking or tree climbing, but in consequence of the fruit's ripeness.

When a policeman is investigating a crime or supposed crime it is his duty to note everything, listen to every voice, and study every object which may enter into a reconstruction of the untoward event, whose unknown origin he is seeking to ascertain. Trial courts should not impede officers in the fulfillment of their sworn duties. To so impede them is to imperil the safety of society. A person who has already killed, robbed, or burglarized, may repeat his violence. Thus, it is imperative that the policeman question all persons in the immediate territorial and chronological area of

committed violence in order to take whatever precautions may be necessary to prevent a repetition of violence.

The laudable desire to protect individuals who come, voluntarily or involuntarily, within the scope of a policeman's inquiry, from making statements which may later become self-accusing, should not prevent those same individuals from speaking freely to illuminate a situation enveloped in darkness. Particularly is this true when, as in the case before us, the talker seizes the attention of the policeman, and then expresses relief after pouring into his ear the burden which has troubled the talker's consciousness.

The Supreme Court of the United States pointed out in the *Miranda* case that its decision was "not intended to hamper the traditional function of police officers in investigating crime." It explained specifically: "Generally on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement."

To restrain a policeman from listening when statements are voluntarily made, even though it may later develop that that person is a suspect, is like restraining a policeman from drawing his pistol when someone in his vicinity brandishes a firearm. The list of policemen killed by criminal suspects is a long one, not the least prominent of these tragic happenings being the one of Policeman J. D. Tippit who was shot down in cold blood when he approached Lee Harvey Oswald to question him concerning the circumstances surrounding the assassination of President Kennedy.

Instead of indirectly criticizing Kaminsky for the manner in which he comported himself while Wilma spoke to him, it would seem that his conduct merited

commendation. He displayed control, coolness and receptivity, all laudable characteristics in an officer while investigating circumstances which demand investigation.

The learned court below seemed to be of the belief that, once Wilma mentioned refrigerator, Kaminsky should have told her she had the right to keep silent. But Wilma could have known about the refrigerator incident without being criminally involved. She could have known how the fatal occurrence came about, without being a participant in it. To have told her at this moment that she did not have to speak, might well have caused her to believe, on the hypothesis that she was only a witness, that even as a witness she should not speak.

To require policemen to stop investigating just when they happen upon a clue, which may lead to solving a crime, and further protect society, would be like telling a deep sea diver to surface when he sees the first sign of the sunken ship he is seeking. To compel policemen not to listen to volunteered statements while investigating a homicide, is to put stoppers in their ears and require them to snap handcuffs on their own wrists. Police have the sworn duty not only to protect society from crime but also, by ascertaining how such heartrending accidents occur, to assist in preventing the closing of refrigerator doors and the spilling of scalding water on infants.

The job of a policeman is to help in every manner within his potentialities to make life secure from violence, no matter from whence it comes. It was in the discharge of this dedicated duty that Kaminsky was in the Eperjesi household. It was while investigating, and not accusing, that someone opened a window so that he might look out and see a verbal re-enactment of the shocking calamity which had overtaken the two young boys of the neighborhood, of which Kaminsky

formed a part. It so affected him, he testified, that he "got sort of sick when she told me she closed the door." To say that Kaminsky should have closed the window, without looking, would be to order investigating policemen to wear blindfolds.

The learned court below particularly found fault with Kaminsky because, after Wilma said she had closed the refrigerator door, he asked "Did you know the boys were in there?" If he had not asked that inevitable question he would have qualified for the booby prize of the year. On her own volition, on her own initiative, Wilma said she closed the door of the refrigerator. This wasn't a routine closing of a door on milk, fruit, and butter. This was slamming a door of death on living tots. Did she know that her nephew Florian, with his little comrade, was in there? The question asked itself. How could Kaminsky have avoided putting the question? The query was put, as much to free her from the odious imputation that she might have known the boys were there, as it might have drawn an answer which would implicate her. She could just as easily have answered No as Yes. And when she admitted she knew of the boys' presence in their porcelain coffin, Kaminsky said he "got like butterflies in his stomach."

The defendant's counsel argue in their brief that when Kaminsky talked with Wilma, the investigation of the police had entered into the accusatory stage, and, that therefore, Kaminsky was required to tell Wilma of her right to remain silent. They cite *Escobedo v. Illinois,* 378 U.S. 478, in support of their proposition. There is nothing in *Escobedo* that pours persuasiveness on the mill wheel of counsel's argument. The facts in the *Escobedo* case and the facts in the case at bar are as far apart as the sides of the Grand Canyon at its widest point.

In *Escobedo* the defendant had been arrested by police, handcuffed behind his back, and taken to a police station where he was, for four hours, subjected to an interrogative, badgering process by detectives who kept telling him he might as well admit to the crime with which he was being charged, because they had an overwhelming case against him. The defendant asked to obtain advice from his lawyer. This request was refused. His lawyer came to the police station and remained there two hours demanding to see his client, but he was not allowed to do so. More than that, when the defendant learned his lawyer was in the the police station, he renewed his requests to see him, and he was told that his lawyer didn't want to talk to him. Some of the officers made assurances to the defendant to induce him to make an incriminating statement. The statement was "taken" by a lawyer of the homicide squad who framed his questions so as to lead the defendant into entrapping answers. To compare the circumstances in the Escobedo affair with what happened in the case at bar is like comparing a rabbit in an iron trap with a bird cutting the air in unhampered flight.

In *Escobedo,* Justice GOLDBERG said that when "the police carry out a process of *interrogations* that lends itself to eliciting incriminating statements . . . the accused had been denied "the Assistance of Counsel in violation of the Sixth Amendment . . . as 'made obligatory upon the States by the Fourteenth Amendment.' " It will be noted how Justice GOLDBERG speaks of *interrogations*. Kaminsky carried on no interrogations. His role was that of a hearing ear and not a questioning tongue. He was the anvil on which Wilma struck with the hammer of her own uncoached, unpersuaded confession. He testified: "I didn't know what she was going to tell me. I didn't have any idea." "I just sat there and listened to her. I left her do all

the talking." "I didn't do no talking. She done all the talking."

The voluntariness of her statement was emphasized by what she said and did, after she made it. Kaminsky testified that Wilma said: "I'm glad this is over." "I'm glad I told somebody." "I'm glad I told you, Johnny." "While she was telling me she held both my hands together with both of her hands, and then after she told me she went like this (sigh) breathing real heavy."

In reversing the conviction in the *Escobedo* case, the Supreme Court clearly stated that the *Escobedo* precedent was not to be used as authority for refusing admissions such as the one made by Wilma in Statement No. 1. Said Justice GOLDBERG: "Nothing we have said today affects the powers of the police to investigate 'an unsolved crime', . . . by gathering information from witnesses and by other 'proper investigative efforts.' . . . We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

One cannot help noting that in the *Escobedo* case the police had not only entered into the accusatory stage, they were swimming in the very midst of it. In addition, it should be noted by the courts, which, apparently has escaped the attention of many of them, that Justice GOLDBERG practically made the *Escobedo* case *sui generis* when he said, "under the circumstances here."

We repeat that in the case at bar there was no "focus on the accused" and Kaminsky was not motivated by a purpose "to elicit a confession."

It would appear that many trial judges throughout the nation have been enforcing supposed rules in

the *Escobedo* case without having taken the trouble to read carefully what that case actually says. Some judges, upon hearing of a pronouncement of the highest court in the land, will jump on their *ad hoc* horses and ride their absolutist steeds in all directions without stopping to study carefully the map already drawn for their guidance. There is absolutely nothing, not even a syllable in the *Escobedo* case, which would justify nullification of the volunteered statement by Wilma to policeman Kaminsky.

Nor is there anything in the *Miranda* pronouncement which supports the reasoning of the trial court in declaring that Wilma's statement was obtained without due process. The *Miranda* decision covers four different cases. In each one of these cases the defendant was questioned by police officers in a police station or detective headquarters while "cut off from the outside world." In each of the cases, the Supreme Court pointed out, "the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures."

The opinion of the court, which covers 60 pages, is devoted entirely to the subject of custodial investigation which the Court defined: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

The four cases all shared "salient features—incommunicado interrogation of individuals in a police-dominated atmosphere." The opinion spoke of individuals "swept from familiar surroundings into police custody, surrounded by antagonistic forces," which features were as absent in this case (in Statement No. 1), as force in a nursery.

In upholding Statement No. 1, the lower court makes reference to Wilma's "intellectual capacity,"

stating that "she was certainly no match for the police in knowledge or understanding." Again, it must be stated, even to the point of monotony, that there was no matching of wits between Kaminsky and Wilma. Kaminsky did not engage her in argument, he did not put to her any questions with the exception of the two already indicated and they were as inevitable as breathing. He could not have been less obtrusive if he were an inanimate dictaphone.

Continuing to strike the chord that Kaminsky somehow took advantage of Wilma, the lower court referred to the case of *Gallegos v. Colorado,* 370 U.S. 49, where the Supreme Court held inadmissible a confession made by a 14-year-old boy. The facts in the *Gallegos* case are also on the other side of the Grand Canyon. Gallegos was held practically incommunicado for five days, and then made a confession. During that time he was confined in Juvenile Hall where he saw "no lawyer, parent, or other friendly adult." His mother tried repeatedly but unsuccessfully to see him. The Supreme Court said that a 14-year-old boy "is unlikely to have any conception of what will confront him when he is made accessible only to the police."

It will be observed here also, as in the *Escobedo* case, that the Supreme Court sought to prevent its decision from being used as authority for cases where the facts are different. The high Court said: "There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested was obtained in violation of due process."

Here there was no such failure. Wilma was in her own home. She was not denied opportunity to see anybody or talk to anybody. She had complete freedom of movement. So far as Wilma's mental capacity is concerned, we refer to the lower court's opinion in which appears this assertion: "On November 17, 1965, Dr. William C. Ryan, M.D., Superintendent of Somerset State Hospital, by written report to this court, stated that while the defendant's intelligence level is borderline, at best, she is mentally and physically capable of speaking in her own behalf at this time."

We are dealing here, not with a 14-year-old boy, but a 38-year-old woman. Obviously she is not of a high order of intelligence. Her school education ended with the third grade. However, a reading of her testimony, as it appears in the transcript of the tape recording, would indicate that Wilma was thoroughly capable of understanding the essential facts of life. Her speech was not rambling or unintelligent. She spoke with an awareness of the facts in the case. She knew the persons who were in her presence, and, in some instances, so indicated.

At the hearing before the court, the Judge asked Frank Rose, who was present at the time Statement No. 2 was given, as to his appraisement of her "mental capabilities or capacity." The exchange follows: "Q. The purpose of that question was simply to find out whether you know her sufficiently well to express an opinion as to whether she has the mental capacity to willingly and knowingly and understandingly waive her constitutional rights to remain silent and to have the assistance of counsel. A. Well, as far as I knew the woman, I mean I seen her and heard her talking to different people, and she sounded normal enough to me, and when she made this statement there she immediately said she made this statement, and she knew what she was doing."

We are satisfied that the lower court erred in suppressing Statement No. 1, and so hold.

Statement No. 2 was properly suppressed because, while in the office of the justice of the peace, Wilma was subjected to questioning without having been informed by the questioners that she had the right to remain silent.

Tightly applying the standards laid down by the Supreme Court, Statement No. 3 could qualify as admissible as evidence because the questioning policeman informed her she did not have to speak and, after receiving that advice, she "agreed to" answer the questions put to her. Nor did she ask to see a lawyer before speaking. However, in determining the admissibility of confessions or statements, the Judge should consider not only the legalistic criteria propounded by the appellate courts, but also the "totality of circumstances" referred to in the *Gallegos* case. In view of the fact that the court below was about to appoint attorneys to represent Wilma, when the police questioned Wilma in the Fayette County Jail, and in view of the interrogation which had already occurred in the office of the justice of the peace, we will, in the exercise of excessive caution in behalf of those called upon to answer to the law, rule that the "totality of circumstances" warranted the court below in suppressing Statement No. 3.

Reversed with a procedendo consonant with this Opinion.

Mr. Justice JONES, Mr. Justice EAGEN, Mr. Justice O'BRIEN and Mr. Justice ROBERTS concur in the result.

DISSENTING OPINION BY MR. JUSTICE COHEN:

The opinion of the lower court reveals that Dr. William C. Ryan, Superintendent of Somerset State Hospital, submitted to the court a written report stating that the intellectual level of the defendant was

"borderline at best." In my opinion, this is an insufficient evaluation of the defendant's mentality with respect to determining whether or not she was fit to stand trial. I would not make the determination now made by the majority, but would remand this entire proceeding to the court below with instructions that an exhaustive mental examination of the defendant be undertaken. In my view, the representation by counsel of a defendant who lacks the mentality to communicate with him is an unconstitutional deprivation. Accordingly, I would want to know the defendant's mental capacity before requiring her to stand trial for murder.

I dissent.