Commonwealth *v.* Leaming, Appellant.

Argued April 29, 1968.   Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Leonard Turner,* with him *Louis S. Cali,* for appellant.

*Joseph M. Smith,* Assistant District Attorney, with him *Benjamin H. Levintow* and *Michael J. Rotko,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, November 12, 1968:

The appellant, Joseph Leaming, stands convicted of the homicide of Irving Brown which took place on or about February 4 or 5, 1965.

The factual background of this homicide may be briefly stated.   On February 4, 1965, at approximately 7:30 p.m., Irving Brown, with some friends, went to a Philadelphia taproom, became intoxicated and openly displayed a roll of $10 bills which he asked a Mrs. Al-

turo, one of his companions, to hold for him but she declined to do so. One Bates, another taproom patron but not in Brown's party, was observed making and receiving telephone calls and he was later joined by two other persons. About 11 p.m., Brown and three friends, including Mrs. Alturo and a Mr. and Mrs. Dutro, went to Dutro's home where Brown was induced to spend the night because of his intoxicated condition. Brown, prior to sleeping on the sofa, gave his money—$2,000—to Mrs. Alturo for safekeeping. Later Mrs. Alturo, accompanied by Mr. Dutro, decided to go to her home and, looking out Dutro's window, noticed Bates and two unknown persons approaching Dutro's home. Within seconds thereafter, the two unknown persons—one wearing a hood and sunglasses and the other glasses—entered the Dutro home, said they were "Ferguson's Squad"[1] and inquired for Brown. Brown awoke, identified himself and was told he was under arrest for "numbers" and was taken from the home, placed in Brown's car and driven away. Police were notified.

About 11:30 p.m. that same evening, several employees of a business concern located in Dutro's neighborhood parked their cars on a parking lot near their place of business. One of these men saw two men pinning an older man against a car parked nearby and heard the older man shout "Help". At first, believing the incident to be a prank, this employee went to his place of employment and then decided to investigate further. As he approached the parked car, this employee was told to stay away saying "We are police officers making an arrest. If you come any closer, we'll shoot" whereupon the witness ran away and called police. Brown's body was finally located in the late

---

[1] Apparently, a reference to Captain Ferguson of the Philadelphia police department.

afternoon of February 12 near Toms River, New Jersey.

Leaming was apprehended on February 11, 1965 by Camden, New Jersey authorities acting on a request by Philadelphia police and arrested on the pretext of a parole violation although, in actuality, he was then a principal suspect in Brown's disappearance. At the time of arrest, Leaming was 22 years of age and possessed of a seventh grade education. Following his arrest, he was incarcerated at the Camden County, N. J., jail in a maximum security cell where he was held from February 11, 1965 until March 2, 1965. During this period of approximately twenty days, he was repeatedly interviewed and questioned by both Camden and Philadelphia authorities.

On February 11 and 12, through questioning of Leaming, certain facts and information were obtained with the result that, on February 12, Leaming agreed to show the officers the location of Brown's body if he could have an attorney present. Leaming was then allowed to call his sister in the hope of obtaining an attorney although he had previously made the same request and had been denied. Following this phone call, Leaming, in company with several police officers, was taken on an automobile ride to the pinelands in New Jersey near Toms River and Brown's body was pointed out to the detectives by Leaming. *Up to this time, Leaming had never been warned of his constitutional rights.*

Following Leaming's return to jail and subsequent to the discovery of Brown's body, Joseph Sherman, a New Jersey attorney, visited Leaming. Sherman did warn Leaming of his rights but there was no indication as to exactly what warnings were given although Sherman felt he had "pre-dated Miranda". At this time, Leaming was awaiting first aid treatment for an

injury and was highly nervous. Leaming was repeatedly asked to give a statement during the period from February 11 to March 2 and was told that things would go light on him if he cooperated. On February 13, he was told that he would be a "patsy" if he didn't cooperate and that, if his alleged accomplice, Whalen talked, he was liable to put all the blame on Leaming. Leaming frequently requested counsel between February 13 and March 2 but was told he would get Philadelphia counsel. During this period, he was repeatedly questioned by police until his removal to Philadelphia on March 2, but he was not interrogated during the period from March 2 to March 10.

On March 10, Leaming was given a preliminary hearing at which time he was fully advised of his rights by the magistrate and arrangements were made to appoint counsel for him. Prior to the arraignment, Leaming was told that his alleged accomplice Whalen had been apprehended in Florida on March 9. The police told him that "Whalen" might have a story to tell and that, if he did, Leaming was liable to end up a "patsy" and, if he wanted to give a statement, then this was the time to do it. Leaming responded to the effect that he wished to think it over. Shortly after the preliminary arraignment, the police asked him what he thought and Leaming responded "Let's go". Leaming was then taken to the Detective Division office where he gave detectives a detailed 22 page statement, in the form of questions and answers, which he signed on every page and at its conclusion. The preliminary questions which Leaming answered in the affirmative related as to whether he understood that anything he said might be used against him, whether he knew of his right to remain silent, whether he had the advice of an attorney prior to being returned to Philadelphia on March 2, whether he wished to make a statement in

view of his being warned of his rights earlier at his preliminary arraignment and whether he was making this statement of his own free will and without force, fear, threats or promises being made to him. Thereupon, Leaming gave a written statement on March 10, the admissibility of which presents the principal issue on this appeal.

Since Leaming's first and second contentions deal with the same set of facts, we shall consider them together. Leaming's first contention is that the written statement of March 10 is inadmissible in evidence because the circumstances under which it was given failed to satisfy the constitutional standards as enunciated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

The *Miranda* guidelines applicable to all criminal trials commencing subsequent to June 13, 1966 (*Johnson v. New Jersey*, 384 U.S. 719, 732, 86 S. Ct. 1772 (1966)), are presently applicable since Leaming was brought to trial on September 27, 1966. Consequently, we must determine the admissibility of this confession by the *Miranda* guidelines.

*Miranda* requires that a person undergoing custodial interrogation must be warned that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to consult with an attorney of his own choice and to have that attorney present while he answers any questions and that, if he is unable to afford an attorney, one will be provided for him before he is asked any questions. See: *Miranda v. Arizona*, supra, p. 444. "Custodial interrogation" occurs when the questioning is initiated by a law enforcement officer *and* when a person has been taken into custody or otherwise deprived of his freedom of action in any significant way (See: *Miranda*, supra, p. 478) and when questioning commences while

the investigation focuses on the accused. See: *Miranda*, supra, p. 444; *Com. v. Jefferson*, 423 Pa. 541, 546, 226 A. 2d 765 (1967).

At the time of Leaming's arrest on the pretext of a possible parole violation, he was then a principal suspect in Brown's disappearance and, following his arrest, he was immediately incarcerated in the Camden County jail. Therefore, at the time of arrest and incarceration and prior to any police interrogation, it was the duty of the police to warn Leaming of all his constitutional rights and the factual background of this appeal indicates the police acted otherwise.

On February 11, the date of his arrest and incarceration, Leaming was questioned for approximately five hours without ever having been warned of his rights as required by *Miranda* and was asked to give a statement which he refused to do. Moreover, his request to telephone his sister for the purpose of securing the assistance of counsel was denied. When a person is in custody and interrogation is initiated by the police, he is entitled to be warned of his full constitutional rights (*Miranda*, supra, p. 477 (1966); *Com. v. Jefferson*, 423 Pa. 541, 546, 226 A. 2d 765 (1967)) and, additionally, all questioning must immediately cease whenever the accused states that he wishes to remain silent or that he desires counsel. See: *Miranda*, supra, p. 474. Since Leaming's refusal to sign a statement was indicative of his election to remain silent and since he was refused the right to make arrangements for counsel, all police questioning should have ceased at that point. Although Leaming made no incriminating statements on this date, a discussion of the events transpiring on February 11 is relevant in that such events illuminate and graphically portray the commencement of unconstitutional police procedure.

Leaming was next questioned on February 12 when he was again asked several times to sign a statement and refused to do so. He did admit that he had information concerning the location of Brown, the victim, but requested that an attorney be present for him when he accompanied police and he was then allowed to make a phone call after agreeing to help locate Brown.

Brown's body was subsequently discovered by the police with Leaming's aid, but Leaming did not see an attorney until several hours *subsequent to the discovery of the body.* It is important to note that until this time, the authorities were not certain that a homicide had, in fact, occurred. Leaming had never been warned of his constitutional rights up to this time and Leaming's statements in the course of leading the police to the location of Brown's body cannot be said to be other than a direct result of his admission to police, *during the course of unconstitutional interrogation,* that he knew where Brown was. The Supreme Court has stated that "unless and until such [*Miranda*] warnings or waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against an accused": *Miranda,* supra, p. 479.

Thus, as to Leaming, the evidence concerning the finding of the victim's remains and all evidence pertaining to the body itself was constitutionally inadmissible against him at trial. In *Killough v. U.S.,* 336 F. 2d 929 (D.C. Cir. 1964), wherein a somewhat similar factual situation arose, the court determined that the evidence was admissible under the facts of that case since the body *would* have been found in due time without the aid of the accused and because the prosecution had other evidence to connect the accused with the body. However, that is not the instant factual

situation. In the case at bar the body was in a deeply wooded area removed from civilization and the police had no other evidence to connect Leaming with the body other than his February 12 oral statement and his subsequent March 10 written statement.

The evidence shows that Leaming was visited by Joseph Sherman, a New Jersey attorney, on the evening of February 12. While there is evidence that Leaming was advised by Sherman of some of his constitutional rights, there is considerable doubt as to Leaming's being advised as to *all* of his rights, particularly his right to appointive counsel and his right to have counsel present during interrogation. Although Sherman's testimony indicates that Sherman felt he had "pre-dated Miranda", the record indicates that, prior to Leaming's meeting with Sherman, Leaming did not know of his right to counsel if he could not afford one and that part of the conversation between Leaming and Sherman dealt with the matter of legal fees and the ability of Leaming's sister to pay Sherman. Additionally, in the meeting between Sherman and Leaming on February 13, Leaming was advised by Sherman that Sherman was not able to do too much since Leaming had no money. Since no presumption arises that a person knew his rights because of his age, education, intelligence or prior contact with authorities, such factors must be regarded as speculative whereas actual warnings must be clearly established. *Miranda*, supra, p. 469.

Moreover, we have declared that an individual cannot *intelligently* waive a right of which he is unaware. See: *Commonwealth ex rel. Mullins v. Maroney*, 428 Pa. 195, 236 A. 2d 781 (1968) ; *Com. v. Ritchey*, 431 Pa. 269, 245 A. 2d 446 (1968). The instant record reveals that, in addition to police requests on February 12 that he sign a statement, Leaming was also told that

the police had enough on him to put him into the electric chair. Furthermore, on February 13, the police told Leaming that, if Whalen, the other principal suspect, was caught, he was liable to place the blame on Leaming and, thus, it would be better for Leaming to cooperate with the police. The Supreme Court guidelines uphold beyond question an accused's right to remain silent unless he chooses to speak in the unfettered exercise of his own will (*Miranda*, supra, p. 460) and psychological coercion arising from the place of questioning, the attitude of the interrogator, deceptive practices or other circumstances is prohibited. Although at this point Leaming did not choose to speak, the statements which the police made plus the fact that Leaming wished to remain silent while interrogation continued make the instant police practices highly suspect.

Although Leaming subsequently gave "dribs and drabs" of information to the police until his removal to Philadelphia on March 2, 1965, he was never warned of his rights and was questioned persistently by the police even though he had previously elected to remain silent and to have the advice of counsel. We conclude that all information gleaned from Leaming prior to March 2 was constitutionally inadmissible against him at trial.

Leaming was not interrogated during the period from March 2 to March 10. On March 10, Leaming was given a preliminary hearing at which time he was fully advised as to his constitutional rights and arrangements were made for appointed counsel for him. Shortly thereafter, Leaming was advised by the police that Whalen had been apprehended and that, if Leaming wished to make a statement, now was the time to do it since he might be a "patsy" otherwise. Leaming then agreed to give a signed statement and did so give

it. This statement consisted of questions and answers which were transcribed, the first few questions of which contained warnings as to certain constitutional rights of the accused.

Our first inquiry concerns the determination whether the *Miranda* guidelines were complied with by the police in obtaining this written statement. The record is clear that Leaming did receive the required warnings at his preliminary arraignment. However, in determining the admissibility of a confession, the court should consider not only the legalistic criteria propounded by the appellate courts, but also the *"totality of circumstances"* surrounding such a confession. *Commonwealth v. Eperjesi*, 423 Pa. 455, 471, 224 A. 2d 216 (1966). The circumstances to be considered in the case at bar are that Leaming had been in confinement for approximately one month, he was repeatedly asked to sign statements, he was never advised of his full rights until March 10, he was repeatedly questioned after he had elected to remain silent, he was also not warned that he was entitled to have the attorney, who was to be appointed for him as a result of the March 10 arraignment, present before he was asked any questions, and the latter warning must be given in clear and unequivocal terms before any questioning commences. See: *Miranda*, supra, pp. 467-8 (1966). In a somewhat similar factual situation, this Court has held that, in view of the fact that attorneys were about to be appointed for an accused and in view of prior questioning which had taken place, the "totality of circumstances" warranted the suppression of the accused's statement given the police by the accused in jail. *Com. v. Eperjesi*, 423 Pa. 455, 471, 224 A. 2d 216 (1966). It should be noted that, in *Eperjesi*, the suppressed statement was made two days after the date of the preliminary hearing whereas, in the case at bar, Leaming's

statement was taken the same day as the preliminary hearing. In both instances, the accused had no opportunity to confer with court-appointed attorneys prior to the taking of statements. The Supreme Court has explicitly stated that, once an individual asks for an attorney, all further questioning must immediately cease. See: *Miranda*, supra, p. 474. Since Leaming at his arraignment had asked for appointive counsel, the police should not have questioned him after such arraignment until court-appointed counsel was present or such presence of counsel was intelligently, voluntarily and knowingly waived.

The March 10 statement fails to satisfy the *Miranda* guidelines and, therefore, should have been excluded at trial due to the "totality of circumstances" present in this case.

Due to our determination of the appellant's initial contention, we feel it is unnecessary to consider the applicability of the "fruit of the poisonous tree" doctrine to the statements involved herein.

Leaming's next contention is that the lower court erred in exhibiting to the jury an enlarged color slide photograph of decedent's body taken eight or nine days after his death and after the body had lain in a shallow grave in the pinelands of New Jersey for about eight days. We need not consider the admissibility of this photograph on the ground it was gruesome and prejudicial since we have already concluded that all evidence pertaining to the finding of the body and evidence pertaining thereto was inadmissible as evidence against Leaming.

Leaming's final contention is that the lower court erred in refusing to instruct the jury as requested by Leaming's written points of charge on the issue of voluntariness of the above written statement, as enunciated in *Miranda*. We need not consider this contention

since the confession was inadmissible and evidence thereof should not have been referred to at all in the trial court's charge.

Judgment reversed.

Mr. Justice EAGEN concurs in the result.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

Mr. Justice MUSMANNO did not participate in the decision of this case.