Commonwealth *v.* Richard et al., Appellants.

Argued September 13, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Richard C. Snelbaker*, with him *Martson and Snelbaker*, for appellant, at No. 983.

*Arthur L. Goldberg*, with him *Goldberg, Evans & Katzman*, for appellant, at No. 984.

*Kevin A. Hess*, with him *Edgar B. Bayley, Jr.*, First Assistant District Attorney, and *Harold E. Sheely*, District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., March 31, 1975:

This appeal arises from the lower court's entrance of judgments of sentence against Paul Richard and Theodore Santos after a non-jury trial. Appellants were found guilty of unlawful possession with intent to deliver a Schedule I controlled substance; to wit, 225 pounds of marijuana. Appellants now argue, inter alia, that the lower court erred in refusing to suppress certain physical evidence and particular incriminating statements appellants made after their arrest and request for counsel.

The evidence in the instant case, cast in the light most favorable to the Commonwealth, is as follows: On November 16, 1972, State Trooper Max Seiler received a radio broadcast to the effect that a white International Travelall, California registration SZH992, with two white male occupants, had entered the Turnpike at Breezewood carrying a large quantity of marijuana. Trooper Seiler, who was in the vicinity, responded to the call and soon sighted the vehicle heading east. After calling for assistance, Trooper Seiler followed the van until Trooper Thomas Geary appeared on the scene. With one patrol car in front of the van and one patrol car in the rear, the troopers signalled the driver of the van, appellant Santos, to pull over. Each trooper emerged from his car armed, and instructed the occupants of the van to get out and "spread eagle" against the van. After the "patdown" proved that the appellants were unarmed, the troopers returned their weapons to their cars.

While Trooper Seiler radioed that the appellants had been apprehended, and waited for information concerning the status of the vehicle registration and appellants' drivers' licenses, Trooper Geary gave the appellants their *Miranda* warnings and ascertained that they understood them. He then informed them that the police had reason to believe that they were transporting a large quantity of marijuana, and asked appellants if they would permit the troopers to search their van, advising them as follows:

"I want you to keep this in mind, that if you give me permission and if we would find anything in the vehicle it would be used against you—I want you to understand this. . . . You do not have to give me permission to search the vehicle."

When Trooper Seiler returned to the van (there were no irregularities in appellants' registration or licenses), he also gave appellants their *Miranda* warnings and ascertained that they understood them. He then advised appellants that in Pennsylvania they were not required to consent to the search and could demand that the police produce a warrant. Despite those warnings, Santos and Richard orally consented to the search. Troopers Seiler and Geary, however, were reluctant to search unless appellants consented in writing. Both Santos and Richard then signed a handwritten consent granting the troopers permission to search the van. Appellant Santos then went to the front seat of the van, removed a box from under the seat, and extracted a set of keys which he used to open the tailgate.

There was nothing suspicious about the inside of the van—it contained suitcases, clothing bags, a cooler, a mattress and blankets. Santos then said, "where would you like to start;" and, Trooper Seiler selected one of the suitcases. Santos thereupon opened the combination lock on the suitcase and began removing the clothing inside. Trooper Seiler noticed that among the piles of clothing there was a tightly rolled newspaper, and upon

unrolling the newspaper, discovered a quantity of marijuana. Undaunted, Santos asked where the troopers would next like to look, and Seiler selected a second suitcase, whereupon Santos remarked, "Here's where you make sergeant." Santos undid the combination lock and opened the suitcase which was filled with marijuana packaged in large bundles. Appellants were then handcuffed and taken to the local State Police barracks. A subsequent search revealed other large caches of marijuana, similarly packaged, including 49 kilos concealed in a compartment cut out of the floor of the van and recovered with the plywood flooring. In all, appellants had been transporting more than 225 pounds of the contraband.

At the suppression hearing appellant Santos corroborated the troopers' testimony that they had advised appellants of their rights, including their right to refuse to consent. Santos alleged, however, that the troopers had stated that if appellants did not consent, they would impound the van and get a search warrant. Both troopers disagreed that they had so phrased their advice and explained why they did not—they were aware that representations of the availability of a search warrant could be construed to be coercive and thereby vitiate the consent. The question, therefore, was one of credibility properly left for resolution by the hearing court below.

## I.

It appears that under the rationale of *Whiteley v. Warden,* 401 U.S. 560 (1971), the state troopers did not have probable cause to arrest the appellants merely on the basis of the radio broadcast, nor does the Commonwealth so argue in the instant appeal. Assuming arguendo that troopers were similarly not entitled to stop the automobile,[1] we are left with two hurdles that the

---

1. *Whiteley v. Warden,* 401 U. S. at 573. (Dissenting Opinion by Justice BLACK.)

Commonwealth must surmount in order to justify the search of the van and the seizure of the marijuana: (1) Did the appellants voluntarily consent to the search; and (2) Did the illegal stopping or arrest of the appellants automatically render the marijuana inadmissible as "fruit of the poisonous tree."

Although the lower court determined that appellants were under arrest from the moment the officers ordered them to "spread eagle," and that the arrest was illegal, this decision of the lower court did not dispose of the question of whether or not the appellants' consent to the search was involuntary. It is true that voluntariness of consent rests upon all the surrounding facts and circumstances, and great deference should be given to the decision of the hearing court since that court has had the opportunity to observe the appearance and demeanor of the witnesses and the defendants. As Justice TRAYNOR stated in *People v. Michael,* 290 P. 2d 854 (Cal. 1955): "Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority is a question of fact to be determined in light of all the circumstances." This rule was cited and quoted with approval in *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). Cf., *State v. King,* 209 A. 2d 110 (N.J. 1965); *Rosenthall v. Henderson,* 389 F. 2d 514 (6th Cir. 1968); *United States v. Page,* 302 F. 2d 81 (9th Cir. 1962).

However, in evaluating the voluntariness of consent, a variety of factors have achieved great significance in supporting the conclusion that consent is valid despite the fact of an illegal arrest. In *Armwood v. Pepersack,* 244 F. Supp. 469, 474 (D. Md. 1965), the court, after examining a variety of federal circuit court cases on the subject, stated: "Where the voluntary nature of the alleged consent is attacked, the court sees no reason to distinguish as a matter of law between the express or implied 'coercive' effect of an illegal arrest, a legal arrest

or police action not amounting to arrest but under color of authority." The court then concluded that the circumstances surrounding the consent in that case clearly indicated that the consent was voluntarily given. See also *Alexander v. U.S.*, 390 F.2d 101 (5th Cir. 1968) ; *Gibson v. U.S.*, 149 F. 2d 381 (D.C. Cir. 1945) ; *U.S. v. Burke*, 215 F. Supp. 508 (D. Mass. 1963), aff'd 328 F. 2d 399 (1st Cir. 1964), cert. denied 379 U.S. 849; *U.S. v. Busby*, 126 F. Supp. 845 (D.D.C. 1954) ; *People v. Nawrocki*, 148 N.W. 2d 211 (Mich. 1967).

Perhaps the most persuasive fact in concluding that a consent was voluntarily granted despite the coercive atmosphere of an arrest is the furnishing of advice to the consenter concerning his constitutional rights, especially his right to refuse to consent. Indeed, in the Third Circuit the provision of *Miranda* warnings alone, followed by a consent to search, is not only persuasive but controlling on the question of voluntariness. Thus, the court stated in *United States v. Menke*, 468 F. 2d 20, 24 (3d Cir. 1972): "In [Government of the Virgin Islands v. Berne, 412 F. 2d 1055 (3d Cir. 1969)], we held that where a defendant is given the detailed warnings mandated by Miranda v. Arizona . . . and thereafter 'voluntarily submits to interrogation and freely offers information on the existence and location of specifically identified evidence, and further agrees to surrender the evidence to police, fully cognizant of his right to remain silent and fully aware that the information he provides may be used against him, the seizure of such evidence does not violate the Fourth Amendment. In such a case the accused, by his words and actions, has abandoned any privacy or security in the location of the evidence."[2]

In the instant case, it is undisputed that the appellants were twice given *Miranda* warnings. It is also un-

---

2. See also *United States ex rel. Harris v. Hendricks*, 423 F.2d 1096 (3d Cir. 1970); *United States v. De Larosa*, 450 F.2d 1057 (3d Cir. 1971).

disputed that they fully understood the substance of the rights of which they were apprised. The record also demonstrates that the appellants consented to the search after the troopers had advised them several times that they need not consent and could require the police to procure a warrant from a magistrate. The fact that appellants were in custody, and the fact that the troopers initially displayed their weapons,[3] are simply not sufficient to undermine this clear and convincing evidence of consent, principally because of the troopers' repeated explanations of appellants' constitutional rights under the Fourth, Fifth and Sixth Amendments, appellants' understanding of the warnings and Santos' active assistance in conducting the search. See generally Annotation, 9 A.L.R.3d 858 (1966).

Turning to the question of whether the evidence obtained was fatally tainted as a result of the illegal arrest of appellants, we note at the outset that "de facto causation" is not the criterion for determining whether the evidence was obtained as a consequence of unlawful conduct by the authorities. As our Supreme Court stated in *Commonwealth v. Bishop*, 425 Pa. 175, 182, n. 5 (1967): "Mere 'but-for' causation is not sufficient to establish the causative relationship necessary to taint the post-illegal arrest verbal evidence." Thus, "[c]ourts in a number of cases have applied or recognized a rule that, while the 'fruit of the poisonous tree' doctrine requires the exclusion of all evidence obtained by exploitation of [that initial illegality], it does not bar evidence gained by means sufficiently distinguishable to be purged of the primary taint of such illegality." Annotation, 43 A.L.R.3d 385, 398 (1972), quoting from *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

---

3. The evidence indicates that after the troopers returned their weapons to their patrol cars the appellants were at ease and conversational. Santos' remark, "Here's where you make sergeant," highlights the ambience of the search.

In the instant case, we have already determined that appellants' consent to the search was free of coercion and, therefore, "sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. at 486. See also *Commonwealth v. Bishop,* supra. Therefore, the court properly refused to suppress the evidence seized as a result of the consensual search of appellants' van.

## II.

The appellants' second noteworthy allegation of error is based upon a conversation in the patrol car when Troopers Seiler and Geary were transporting appellants to the district justice's office for arraignment. During that time Trooper Seiler asked Trooper Geary, both of whom were in the front seat, if he had seen a recent television program dealing with the smuggling of marijuana into the United States from Mexico. Upon hearing this conversation, Richard, who was sitting with Santos in the back seat, stated: "If you're ever in California and want marijuana, see me." At that point Trooper Geary asked Santos if the marijuana came from Mexico, and Santos answered, "It's not mine." Whereupon Richard immediately admitted: "It's mine." Since both appellants had indicated at the barracks, prior to these statements, that they wished to speak to an attorney, further questioning of appellants was clearly improper.

In *Miranda v. Arizona,*[4] the Supreme Court stated: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercize his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

---

4. 384 U. S. 436, 473-474 (1966).

Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

While Richard's initial statement that he would sell the troopers marijuana if they were ever in California does not appear to be in response to a question,[5] Trooper Geary clearly had turned interrogator when he asked Santos about the origin of the supply of marijuana. Our Supreme Court defined "interrogation" in *Commonwealth v. Simala*, 434 Pa. 219, 227 (1969) to be "any question likely to or expected to elicit a confession." In the instant case, Santos' knowledge of the origin of the marijuana would have constituted circumstantial evidence establishing his part in an illicit joint venture to purchase and transport the contraband for sale on the east coast, and would have been inadmissible in evidence against him since it was elicited after he requested counsel. However, the evidence of Santos' involvement had already been overwhelmingly established by the fact that his vehicle had been used in, and had been prepared for, the illegal transportation. His implicit knowledge of the contents of the luggage made the inference of guilt irresistible. Further, Santos' remark that the marijuana was not his and, from Santos' point of view, Richard's response that the marijuana was his, demonstrates that Santos' statement was harmless beyond a reasonable doubt. Therefore, with respect to Santos, no reversible error was committed by the court in not suppressing the evidence.

---

5. This remark was clearly blurted-out and, therefore, admissible. As the Supreme Court has stated: "If the defendant, without prodding or inducement by the police which amounts to interrogation, spontaneously confesses or blurts out incriminating statements, those statements are admissible." *Commonwealth v. DuVal*, 453 Pa. 205, 220 (1973). See also *Commonwealth v. Simala,* supra; *Commonwealth v. Feldman*, 432 Pa. 428 (1968); *Commonwealth v. Eperjesi*, 423 Pa. 455 (1966).

Richard, however, was obviously damaged by the admission: "It's mine." Up to that point, the Commonwealth's case against Richard was not strong. All the Commonwealth could prove was that he was a California resident who was a passenger in a vehicle not owned by him which was laden with marijuana. Although he signed the consent to search, any statements he may have made during the search were not offered into evidence. Nor did his blurted statement concerning his ability to procure marijuana in California so damage his case that we can find his subsequent admission of ownership of the 225 pounds of marijuana to have been harmless beyond a reasonable doubt. Thus, if we determine that the remark, "It's mine," was in response to an illegal inquiry of him, Richard is entitled to a new trial.

In the instant case, until Richard admitted ownership of the marijuana, no questions had been directed at him, only at Santos, against whom the Commonwealth already had overwhelming evidence. The fact that no questions were explicitly directed to Richard, however, cannot and should not be wholly determinative of whether the conversation between Santos and Trooper Geary was likely to produce a response from Richard: "[S]ubtle pressures . . . can be applied to encourage or elicit incriminating statements, and we will look carefully to determine whether *Miranda* rights have been violated." *Commonwealth v. DuVal*, 453 Pa. at 222. See also *Commonwealth v. Mercier*, 451 Pa. 211 (1973); *Commonwealth v. Hamilton*, 445 Pa. 292 (1971). Therefore, in situations where the police have used third persons as instruments of interrogation, the courts have found *Miranda* violations. See *Commonwealth v. Hamilton*, supra; *Commonwealth v. Bordner*, 432 Pa. 405 (1968); Cf. *Commonwealth v. Mercier*, supra. It is not necessarily direct questioning by the police which raises the problem of compliance with *Miranda*, but "police conduct . . . calculated to, expected to, or likely to, evoke

admissions." *Commonwealth v. Simala,* 434 Pa. 219, 225 (1969). In the instant case, however, we find that the facts and circumstances surrounding Richard's admission that he owned the marijuana justified the lower court's conclusion that, with respect to Richard, the troopers' conduct was not likely to evoke such admissions.

The two Pennsylvania cases most like the case at bar which have condemned analogous behavior by police posed far stronger cases for suppression. In *Commonwealth v. Hamilton,* supra, the police confronted the appellant with his alleged accomplice knowing that the latter would accuse the appellant of principal responsibility for the felony-murder with which they were both charged. It was admittedly the intent of the investigating officers to thereby provoke the appellant to respond, most likely to his own detriment. However, at no time had they provided appellant therein with his *Miranda* warnings. In condemning this technique of indirect interrogation, the Court emphasized the lack of warnings and the clear intent of the police to evoke inculpatory statements.

Similarly, in *Commonwealth v. Bordner,* supra, the police used the parents of the accused, whom they had prompted to ask a variety of questions, in order to get a confession from the accused. After looking at the totality of the circumstances,[6] the Court concluded: "The circumstances reveal a plan on the part of police authorities to use the [parents] as a police instrumentality in the interrogation of the accused son and the statements made to the [parents] in the context of this factual setting, are as though made to the police themselves."

In the instant case, the circumstances compel no such conclusion of a plan to use Santos as the instrument for procuring a confession from Richard. At all times, the troopers had been careful to respect appellants' con-

---

6. This is the applicable standard under *Commonwealth v. Eperjesi,* supra note 5.

stitutional rights. In light of Santos' already overwhelming implication in the crime, and the light-hearted, if not cavalier, attitude of appellants, the trooper's question concerning the origin of the marijuana appears innocuous—certainly, it could not have been expected or calculated to produce Richard's unresponsive admission of ownership.

The situation in the instant case more closely parallels several federal cases wherein one suspect has made an unsolicited response to a question asked of another suspect in his presence. In these situations, "the general view is that such a response is not the product of 'interrogation,' but a 'volunteered' statement." Y. Kamisar, W. La Fave & J. Israel, Modern Criminal Procedure 584 (4th ed. 1974). Thus, the federal courts have held that suspects who respond to questions asked of third persons, prior to receiving *Miranda* warnings and presumably while unaware of their constitutional rights, have not been interrogated, but rather have volunteered those statements. See *Haire v. Sarver,* 437 F. 2d 1262 (8th Cir. 1971) (husband responded to question asked of wife) ; *Stone v. United States,* 385 F. 2d 713 (10th Cir. 1967) (driver responded to question asked of passenger). The instant case is stronger than the federal cases insofar as the appellants had been apprised of their constitutional rights on several occasions, including the fact that they need not speak and that anything they said could be used against them.

In light of all the facts and circumstances, we find that Richard's admission of ownership was volunteered and, therefore, properly admitted into evidence against him.

Accordingly, the judgments of sentence are affirmed.

JACOBS, J., concurs in result.

———

DISSENTING OPINION BY HOFFMAN, J., at No. 984:

The issue before the Court is whether the appellants' consent to a police search vitiated the illegality of the arrest.

On November 16, 1972, appellants, Paul Richard (a/k/a Richard Anthony Harris) and Theodore James Santos, Jr. were travelling east on the Pennsylvania Turnpike. They were riding in a 1966 International Travelall owned by Santos which was registered in California. At about 1:30 p.m., the police broadcast a description of the vehicle and of the appellants and the belief that the vehicle contained a large quantity of marijuana. The vehicle was spotted by State Trooper Max Seiler, who requested assistance for the purpose of stopping the vehicle. He was joined by Trooper Robert Geary in a separate cruiser. The appellants complied with the Troopers' instructions to pull off the highway. On alighting from their vehicles, Geary armed himself with a 30 caliber carbine and Seiler with a 12 gauge pump shotgun. Geary kept the appellants covered while they were ordered to "spread eagle"; Seiler conducted a body search to assure himself that the two suspects were not armed.

Seiler went back to his cruiser to conduct a license and owner's card check on the appellants. Geary read them their "Miranda" warnings from the standard police form. The appellants stated that they understood their rights. After the warnings were given, Geary asked them for written permission to search the International Travelall. Seiler rejoined them after the license check proved negative. Seiler further warned the appellants that if consent were not given, the troopers would lock the vehicle and swear out a warrant before the district magistrate. Thereafter, the appellants signed a statement of consent prepared by Geary.

The search which followed the execution of the consent form revealed over two hundred pounds of mari-

juana. Following the discovery of the marijuana, the appellants were taken to the State Police Barracks. At the barracks, the appellants signed forms indicating that they wanted to consult with an attorney. Thereafter, on the way to the district magistrate's office, the police officers engaged appellants in what the officers described as an "informal, inquisitive type conversation" that led to an incriminating statement by appellant Richard.

In January of 1973, appellants were indicted on one count of Unlawful Possession with Intent to Deliver a Schedule I Controlled Substance. Appellants moved to suppress the physical evidence and the statement made by appellant Richard. The motions were denied after a hearing on February 26, 1973. Subsequently, appellants waived a trial by jury and were tried before the court on February 28, 1973. A finding of guilt was handed down on May 21, 1973. In January of 1974, appellants' motions in Arrest of Judgment and for a New Trial were denied. On April 16, 1974, appellant Richard was sentenced to two to five years imprisonment and appellant Santos was sentenced to one to three years imprisonment.

In a recent United States Supreme Court case, Mr. Justice STEWART stated the law governing warrantless searches: "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . .—subject only to a few specifically established and well-delineated exceptions.' [citations omitted]. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. . . ." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973).

Another exception to the otherwise strict warrant requirement is that a warrantless search may be made incident to a lawful arrest. *Adams v. Williams,* 407 U.S. 143, 92 S. Ct. 1921 (1972) citing as authority *Brinegar*

*v. United States,* 338 U.S. 160 (1949) and *Carroll v. United States,* 267 U.S. 132 (1925). The arrest must, however, be based on probable cause; absent probable cause to arrest, the arrest is illegal and the evidence seized in the incident search must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471 (1963) ; *Commonwealth v. Mackie,* 456 Pa. 372, 320 A. 2d 842 (1974).

In the instant case, the Commonwealth does not contend that the officers had probable cause to stop the vehicle and concedes that the radio alert was based on insufficient probable cause: "The Commonwealth here does not rely on the radio bulletin to establish probable cause as it does not rely on justifying the search as incident to a lawful arrest, but merely asserts that the bulletin justified the initial stopping of the vehicle."

The Commonwealth attempts to justify the warrantless search on the grounds that the appellants freely consented to the search. The Commonwealth suggests that the stop of the appellants' vehicle was legal; that the initial patdown of the appellants was justified, (see *Terry v. Ohio,* 392 U.S. 1 (1968)) ; that thereafter, a voluntary consent to search the vehicle was made. Inherent in the Commonwealth's argument are at least two assumptions. First, after the patdown but before the consent was granted, the appellants were not under arrest. Second, even if under arrest whether legal or illegal, the appellants could nonetheless effectively consent to the search.

The Commonwealth's argument flies in the face of the recent Pennsylvania Supreme Court decision in *Commonwealth v. Swanger,* 300 A.2d 66 (1973), aff'd on rehearing, 453 Pa. 107, 111, 307 A. 2d 875 (1973): "when a police officer stops a vehicle he has 'seized' the vehicle and its occupants, and thus, the protections of the Fourth Amendment must be considered." The police in the present case observed no viola-

tion of The Vehicle Code of Pennsylvania,[1] and the Commonwealth presents no argument that there was probable cause for the stop of the vehicle. Hence, the stop of the vehicle without a violation of the Code and without probable cause was an arrest without legal justification. Further, once the police had stopped the appellants and had conducted the initial patdown,[2] there is no question that the appellants were under arrest. In fact, the police told appellants that they could either consent to the search or the officers would lock up the vehicle on the side of the road and take the appellants before a district magistrate. That is, the officers themselves made clear that the appellants were being restrained. (Cf. *Henry v. United States*, 361 U.S. 98, 103 (1959): "When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this particular case, was complete.") Hence, before probable cause was shown, appellants were under arrest.

Once the appellants were under arrest, the subsequent "consent" was tainted by prior police illegality: the police told appellants that they had a valid basis for the arrest when in fact, they did not; therefore, appellants merely acquiesced in that show of force which they assumed was lawful. They did not voluntarily consent. *Bumper v. North Carolina*, 391 U.S. 543 (1968). In addition, *Wong Sun*, supra, dictates that the statement made by appellant Richard must also be suppressed because it was the fruit of the illegal arrest.

---

1. 1959, April 29, P.L. 58, §101; 75 P.S. §101 et seq.

2. Appellee points to *Adams v. Williams*, 407 U.S. 143 (1972) as controlling. In *Adams*, the police officer had a reasonable suspicion of criminal activity to justify a "Terry" patdown. See *Terry v. Ohio*, supra. The patdown revealed a weapon which justified further search incident to a lawful arrest. In the instant case, the patdown, even if legal, revealed nothing. The subsequent detention of appellants, therefore, was not justified.

Finally, even if the consent to the search supplied the justification for the search of the vehicle, the appellants did not thereby also consent to the illegal arrest. Assuming a knowing and intelligent waiver of the right to be free from an unreasonable search, the Court cannot infer from that waiver an additional waiver of the right to be free from illegal arrest. Indeed, this Court must be mindful that " 'courts [must] indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938) [footnote omitted].

Therefore, the judgment of sentence should be reversed and a new trial granted.

---

CONCURRING OPINION BY SPAETH, J.:

The difficulty with this case, as I see it, is not in the law but the facts. Judge HOFFMAN'S opinion states that "Seiler further warned the appellants that if consent were not given, the troopers would lock the vehicle and swear out a warrant before the district magistrate. Thereafter, the appellants signed a statement of consent prepared by Geary." However, as Judge CERCONE'S opinion notes, "Both troopers disagreed that they had so phrased their advice and explained why they did not —they were aware that representations of the availability of a search warrant could be construed to be coercive and thereby vitiate the consent. The question, therefore, was one of credibility properly left for resolution by the hearing court below."

Plainly, the hearing judge might have found that appellants had not voluntarily consented to a warrantless search. Not only might the judge have believed that the troopers had threatened to lock the vehicle; he might also have placed some emphasis, as Judge HOFFMAN does, on the facts that when approaching the vehicle, the troopers were armed, and used their weapons to keep appellants covered.

Nevertheless, we cannot reverse a hearing judge's findings except for abuse of discretion, *Commonwealth v. Knowles,* 440 Pa. 84, 269 A. 2d 739 (1970), and when the entire record is considered, I think it fair to say there was no such abuse. Accepting the troopers' testimony, it appears that appellants were specifically told they did not have to consent. Further, the troopers took the unusual precaution of obtaining appellants' written consent. And finally, the manner in which appellants conducted themselves manifests a hard-boiled bravado, which, on balance, persuades me that although most persons would have found the circumstances too threatening to permit of voluntary consent, appellants did not.