Commonwealth *v.* Franklin, Appellant.

412

Argued January 9, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*D. M. Masciantonio,* for appellant.

*Michael M. Baylson,* Assistant District Attorney, with him *James D. Crawford,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, May 4, 1970:

At about 7:00 p.m. on November 27, 1967, Earl Franklin had an altercation with his "girl friend,"

Vanessa Stafford, outside her home on Sixth Street in Philadelphia. While he was kicking and punching her (eventually beating her, semi-conscious, to the ground), a crowd of boys formed across the street, yelling for help. As the result of their cries, Junior Jackson came out of his house which was across the street, approached Franklin and told him to stop beating Vanessa. A very brief argument ensued and Jackson inflicted a three and one-half inch knife cut on the back of Franklin's neck.

As Franklin was chasing Jackson up the street, Officer Culver arrived, at about 7:10 p.m. After being assured by Vanessa that she was all right, Culver returned to his prowl car and was about to leave when Franklin approached him and complained of having been cut. The officer testified that he volunteered to take Franklin to the hospital for medical treatment, but Franklin refused and told him, "I will get a gun and take care of the [s.o.b.] myself." When asked to clarify this statement, Franklin assured the officer that he was speaking in jest, and Culver left.

After the officer's departure, Franklin went to a nearby house, obtained a .38 caliber Smith & Wesson revolver which he owned, and walked to a bar at the corner of Sixth and Cumberland Streets. Birdella Riley, who had been with Jackson when he cut Franklin on the back of the neck, was sitting in a car in front of the bar. Franklin arrived at about 7:20 p.m., put his gun to her head and asked where "the man" had gone. She indicated that Jackson was in the bar. As Franklin walked towards the door of the bar, Jackson came out, saw Franklin, and pulled his knife again. Franklin responded by removing the revolver from his pocket and shooting Jackson once in the left eye, the wound being fatal.

Although he claimed to have been acting in self-defense, Earl Franklin was convicted of second-degree

murder, on March 27, 1969, after a jury trial in the Criminal Division of the Court of Common Pleas of Philadelphia. We presently have before us a direct appeal from the judgment of sentence which was entered by the trial court, after denial of the defendant's post-trial motions.

The primary issue raised is whether the trial court erred in its conclusion that a certain written statement by Franklin was admissible under the rules of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).[1]

At 8:00 p.m. on November 27, 1967, Officer Culver arrested the defendant at St. Luke's Hospital, where he had gone after he killed Jackson to obtain treatment for his knife cut. The officer waited while the defendant was given stitches and had his neck wound bandaged, then returned to the station house with his prisoner. No questioning took place at the time of arrest; in fact, Officer Culver testified that when he told Franklin that he was under arrest and need not say anything, the defendant responded that he was well aware of his rights under the law.

At 9:40 p.m., the defendant was brought to an interrogation room where Detective Thompson first advised him as follows: "We have a duty to explain to you and to warn you that you have the following legal rights: A. You have a right to remain silent and do not have to say anything at all. B. Anything you say can and will be used against you in court. C. You have a right to talk to a lawyer of your own choice before we ask you any questions, and also to have a lawyer here with you while we ask you questions. D. If you cannot afford to hire a lawyer, and you want

---

[1] A suppression hearing was held prior to trial, during which testimony was taken concerning the circumstances surrounding all of Franklin's in-custody interrogation. The *Miranda* standards were

found to have been met, and the statement declared to be admissible into evidence,

one, we will see that you have a lawyer provided to you, before we ask you any questions. E. If you are willing to give us a statement, you have a right to stop any time you wish." Franklin was then questioned as to his understanding of his rights, and he responded affirmatively to the effect that he understood his rights. See *Commonwealth v. Medina,* 424 Pa. 632, 227 A. 2d 842 (1967). The defendant then stated that he wanted an attorney and all questioning ceased, as it must under such circumstances. *Miranda v. Arizona,* 384 U.S. 436, 473-74, 86 S. Ct. 1602 (1966) ; *Commonwealth v. Leaming,* 432 Pa. 326, 332, 247 A. 2d 590, 594 (1968).

During the next few hours, Franklin was fed and he attempted to contact his own attorney several times but was unsuccessful. At around midnight, the defendant still being unable to locate his own attorney, an assistant public defender was called to consult with him. However, Franklin was apparently not satisfied with this conference, and he declined the services of the public defender. The defendant then spoke privately with his wife, Rosalyn, for half an hour, drank some coffee and rested in an interrogation room.

At approximately 3:00 a.m., as he was being taken to another part of the building to be fingerprinted and photographed, Franklin, who had been completely and understandingly informed of his rights, *volunteered* to make a statement. Detective Thompson, being questioned by the assistant district attorney at the suppression hearing, testified to the circumstances which led to the statement. "Q. Then what occurred? A. Then on our way down in the elevator he told us he would tell us what happened. He returned to Room 104 and we started taking a statement from him. Q. Let's get into this on the elevator on the way down. Had you asked him anything? What was going on in the elevator that he made this statement that he would tell you what happened? A. We was talking in general and I

told him we didn't have to have a statement from him because witnesses had identified him but we would like to hear his side of the story. At this time he said, "Take me back up and I will tell you what happened.'" There was no subterfuge employed here, since it was perfectly true that the police already had at least three witnesses who knew Franklin and who had given statements as to what had happened. In fact, the only use that was made of the statement was to impeach Franklin's credibility, after he testified, by comparing his trial testimony with two small, nonincriminatory, portions of the statement.[2] It cannot be said, on the factual posture of this record, that Franklin's will was overborne when he decided to give his statement.

Nevertheless, before any actual questioning took place, Franklin was once again given a full explanation of his rights. First, he was read the same statement of his rights that was used at 9:40 p.m., when he initially decided not to answer any questions. The interrogating officer then asked a series of seven questions, as follows: "1. Do you understand that you have a right

---

[2] The first part of the statement introduced at trial refers to how and why Franklin got to the bar where the killing took place, the bar being in the opposite direction from the hospital, and reads as follows: "Then I ran around Marshall Street and came down Cumberland. My intentions were to go up and see Vanessa first and try to get to the hospital. But my neck was bleeding pretty bad. As I walked over to the bar to see if she was in there." This was produced to compare with Franklin's trial testimony that he had gone to the bar to ask the owner to take him to the hospital, not Vanessa.

Franklin also said at trial that, after he shot and killed Jackson, he first left the gun at the house of a friend, Mildred, and then had another friend drive him to the hospital. On cross-examination, this was compared with the following portion of his written statement. "He fell and I ran back down 6th Street and threw the pistol down York Street. From there I run to 6th and Diamond and I got a towel from the lady bartender. From there I ran on down to St. Luke's Hospital. That's where I was arrested at."

to keep quiet and do not have to say anything at all? Answer, 'Yes, I understand that.' 2. Do you understand that anything you say can and will be used against you in court? Answer, 'Yes, I understand.' 3. Do you want to remain silent? Answer, 'No, I will give a statement.' 4. Do you understand that you have a right to talk with a lawyer before we ask you any questions? Answer, 'Yes, I do.' 5. Do you understand that if you can't afford to hire a lawyer and you want one, we will not ask you any questions until a lawyer is appointed for you? Answer, 'Yes, I do.' 6. Do you want either to talk with a lawyer at this time, or to have a lawyer with you while we ask you questions? Answer, 'No, I will give a statement.' 7. Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you? Answer, 'Yes, I am.' " Since Franklin knowingly, intelligently and voluntarily waived his rights, the questioning which took place at 3:00 a.m. was proper and the statement admissible. See, e.g., *Commonwealth v. Bordner*, 432 Pa. 405, 247 A. 2d 612 (1968). The record is perfectly clear that the defendant was very thoroughly informed as to the rights to which he was entitled, and that he understood those rights. "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602 (1966). Moreover, there is utterly no evidence that the defendant was coerced or "worn down" in any way whatsoever. No trickery or deception was employed to beguile the defendant into falsely thinking that it would be in his best interests to give a statement. Viewing the totality of the circumstances, as we must (*Commonwealth v. Bordner*, 432 Pa. 405, 419, 247 A. 2d 612, 619 (1968); *Commonwealth v. Eperjesi*, 423 Pa. 455, 471, 224 A. 2d 216, 224 (1966)), we find this

statement to have been properly taken and correctly admitted into evidence. See *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602 (1966) ; *Commonwealth v. Feldman*, 432 Pa. 428, 433-34, 248 A. 2d 1, 3-4 (1968) ; *Commonwealth ex rel. Vanderpool v. Russell*, 426 Pa. 499, 502, 233 A. 2d 246, 247 (1967).

The statement being admissible, the only issue left for determination is whether the trial court's charge to the jury, on the question of self-defense, was improper. The defendant now complains about that segment of the charge on self-defense wherein the court explained that Franklin could not now claim to have killed his victim in self-defense, *if* the jury were to find that Franklin went looking for Jackson with a criminal intent, expecting that such confrontation would necessitate his use of the gun. To explain himself, the court analogized to "a classical case, *but not like this one,* where a man goes into a marketplace in order to hold up the proprietor. He is committing a felony at that time. He knows that the danger of having to defend himself exists. Under those circumstances, he has no right to claim self-defense because he set the moving factors into being." (Emphasis added)

It is hornbook law in Pennsylvania that, when considering an alleged error in the trial court's charge to the jury, the charge must be read as a whole. *DeMichiei v. Holfelder*, 410 Pa. 483, 189 A. 2d 882 (1963) ; *Commonwealth v. Clanton*, 395 Pa. 521, 151 A. 2d 88 (1959). When read in context, it is clear that what was conveyed to the jury by the trial court was simply that one who is the aggressor cannot later claim self-defense, when he acted in response to a physical threat by the victim which the aggressor *knew* would be forthcoming. *Commonwealth v. Minoff*, 363 Pa. 287, 291-92, 69 A. 2d 145, 148 (1949) ; *Commonwealth v. Zec*, 262 Pa. 251, 257, 105 A. 279, 281 (1918) ; 40 C. J. S.

*Homicide* §§117-22 (1944). In short, one man cannot provoke another man into a fight, knowing that the second man will probably use his knife, and then claim that he shot the second man in self-defense, to ward off the expected knife attack. The evidence in the instant case supports a finding that this is precisely what happened between Franklin and Jackson. Accordingly, we find no error in that portion of the charge complained of.

Judgment affirmed.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

In *Miranda v. Arizona,* 384 U.S. 436, 473-74, 86 S. Ct. 1602, 1627-28 (1966), the United States Supreme Court held: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, *the interrogation must cease until an attorney is present.* . . . If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Emphasis added)

There is no question that in the instant case appellant was informed of his *Miranda* rights and did state that he wanted to contact his attorney.[1] The

---

[1] Appellant received his *Miranda* warnings, and requested counsel, at 9:40 p.m. Over the next eight hours the following occurred:

10:00 p.m.: questioned by police officer about how he sustained knife wound in neck.

only question is whether interrogation ceased, whether the police did "respect his decision to remain silent." If interrogation did not cease—and I believe that it did not—*Miranda* requires that the confession obtained be excluded from use at trial.

The testimony of Detective Thompson, given at the suppression hearing, speaks for itself: "Q. [defense counsel] How many times had he asked for an attorney . . . ? A. He had asked once. He told me once that he wanted an attorney. This was around 9:40, 9:45 [P.M.] when I first went in to interview him. Q. At that point I think you said you stopped questioning him because he said that he wanted an attorney; is that correct? A. True. Q. When did you continue or begin again to question him? A. When I again questioned him was when I was taking him down to the cell room [at 2:55 A.M.]. . . . We was talking in general and I

| | |
|---|---|
| 10:25 p.m.: | attempted to call his attorney, but failed; returned to interrogation room and given something to eat. |
| 11:30 p.m.: | informed by police that he was to be placed in a line-up; refused services of Voluntary Defender to represent him at line-up and refused to participate in line-up. |
| 12:35 a.m.: | confrontation with three witnesses without a line-up or counsel. |
| 12:50 a.m. to 1:20 a.m.: | permitted to talk with wife. |
| 1:20 a.m. to 2:30 a.m.: | drank coffee. |
| 2:30 a.m.: | neck wound photographed by police. |
| 2:45 a.m.: | slated by police. |
| 2:55 a.m.: | in elevator on way to be photographed and fingerprinted, in response to police-initiated interrogation (see text following note 1, *infra*), acquiesces in giving police a statement. |
| 3:00 a.m.: | statement begins; appellant again given *Miranda* warnings. |
| 5:35 a.m.: | statement concluded. |

told him we didn't have to have a statement from him because witnesses had identified him but we would like to hear his side of the story. At this time he said, 'Take me back up and I will tell you what happened.' * * * Q. On this trip down the elevator *when you started to talk* to the defendant, was that *initiated* by you or Lieutenant Patterson? A. That was *initiated* by me." (emphasis added)

This testimony certainly shows that the police recommenced the questioning of appellant without counsel, despite appellant's request, thus violating the holding of *Miranda*.[2] In fact, the type of questioning used here is quite similar to the subtle interrogation which this Court recently held impermissible in *Commonwealth v. Simala,* 434 Pa. 219, 252 A. 2d 575 (1969). In *Simala,* the police brought the defendant into the mayor's office, where he sat for one-half hour. The mayor then said: " 'What's the matter, Mike, you look kind of down in the dumps; do you want to talk? . . . if you want to talk, talk.' " *Id.* at 222, 252 A. 2d at 576. We held that these statements by the mayor constituted interrogation and that the resulting confession was inadmissible: "This certainly was not an innocent attempt on the part of the mayor to strike up a friendly conversation to help appellant pass the time until the police returned from their search. There is no difference for constitutional purposes between questioning an accused outright and more subtly suggesting that he incriminate himself without being asked specific questions. . . . In our view, *any question likely*

---

[2] Just as giving the *Miranda* warnings only after interrogation has begun cannot cure the original defect, the giving of the warnings before taking his statement, but after the questioning in the elevator—and after appellant had asserted his rights—cannot cure the error. Certainly these warnings must have rung hollow to appellant, since they were given at 3:00 a.m., some five and one-half hours *after* interrogation was supposed to have stopped.

*to elicit a confession* constitutes 'interrogation' under *Miranda.*" *Id.* at 227, 252 A. 2d at 579 (emphasis added).

Certainly the officer's request for appellant's side of the story was "likely to elicit a confession" and thus constituted interrogation. Yet the majority holds that appellant's statement was "volunteered." I fail to see how the majority can reach this conclusion, for the confession was clearly given in response to police-initiated questioning. This is hardly a case where a confession was given by an accused "without any prompting." *See Simala,* 434 Pa. at 226, 252 A. 2d at 579.

Although *Miranda* holds that after a suspect requests counsel *all* interrogation must cease,[3] the police conduct involved here did not show appellant that his interrogators were "prepared to recognize his privilege should he choose to exercise it." *Miranda,* 384 U.S. at 468, 86 S. Ct. at 1625. On the contrary, the constant custodial pressure on appellant could only have convinced him of the futility of further resistance.[4] In

---

[3] Cf. *United States ex rel. Daley v. Yeager,* 415 F. 2d 779, 783 (3d Cir. 1969): "Once the prosecution has commenced, law enforcement officers may not secure confessions from an accused which circumvent the protection a lawyer might provide."

[4] It is to be noted that when appellant gave his statement he had been in custody for five hours, he was tired, he had recently received stitches in his neck for a knife wound, he had been confronted by witnesses in a possibly unconstitutional manner, he had not as yet been brought before a magistrate, and he had never been left alone to relax, spending most of his time in a small interrogation room. This raises serious doubts about the voluntariness of the confession, even apart from *Miranda.* See *Culombe v. Connecticut,* 367 U.S. 568, 81 S. Ct. 1860 (1961) ; *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A. 2d 426 (1968). However, I find it difficult, on the state of this record, to decide whether appellant's will had been overborne. There is no indication that an opinion has ever been filed by the suppression court or the trial court, and thus it is extremely difficult to review that court's decision as to voluntariness. Hence, in any event, the case should at

essence, appellant was merely *told* of his right to the assistance of counsel—he was never allowed to exercise it.

I dissent and would grant appellant a new trial.

least be remanded for the filing of an opinion, see Pa. S. Ct. R. 63, so that we might properly decide this issue.