## Commonwealth *v.* Cost, Appellant.

592

Argued April 17, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*William M. Baily,* with him *Thompson and Baily,* for appellant.

*James A. Caldwell,* Assistant District Attorney, and *W. Bertram Waychoff,* District Attorney, submitted a brief for Commonwealth, appellee.

OPINION BY JACOBS, J., March 29, 1976:

Appellant was convicted of burglary and robbery following a jury trial in May, 1974, and was sentenced to serve a term of one to ten years on the burglary count and a term of four to fifteen years on the robbery count; the terms to run concurrently. The charges against the appellant arose from an incident occurring on the evening of January 19, 1974. A tavern owner, Dominic Mandarano, testified that appellant and a companion, whose name Mandarano did not know, were drinking beer and playing pool at his tavern in the afternoon and evening of January 19, 1974. At some time after 9:00 P. M., appellant and his companion were the only two customers remaining in the tavern. Mandarano, seated at the bar watching television, was struck from behind and knocked to the floor by appellant's companion, a stranger to Mandarano. Mandarano testified that he remained conscious and that appellant's companion removed $150.00 to $250.00 from his pocketbook and another $110.00 from the cash register located behind the bar. Further, Mandarano testified that when he was struck, the appellant was not present but had left the bar a few moments before the incident and was not seen again by Mandarano.

Louis Vecchio and Charles Gapen who were in Vecchio's bar across the street from Mandarano's tavern observed appellant leave and enter the Mandarano tavern

several times during the evening. After the attack on the tavern owner, the victim's son, Bruno Mandarano, along with Vecchio and Gapen, accompanied Troopers Hertig and Martinelli in their search for appellant and his companion, who were the only suspects at that time. Appellant was located at his stepfather's residence at approximately 2:00 A. M. He was taken to the patrol car and was asked to sit in the front seat where he was questioned by Trooper Michael Hertig of the State Police. Vecchio, Gapen, and Bruno Mandarano were in the back seat of the car.

At trial, Trooper Hertig testified that he immediately[1] read appellant his constitutional rights from the standard state police waiver form. He further testified that appellant refused to sign the waiver form[2] but that the appellant "advised he understood his rights." Official Transcript, N. T. at 119.

At the suppression hearing Louis Vecchio, Charles Gapen and Bruno Mandarano all testified that the appellant was given his constitutional rights, and Charles Gapen and Bruno Mandarano testified that the appellant said he understood his rights.[3] Trooper Martinelli testi-

---

1. At the suppression hearing, appellant testified that he was in the patrol car for about 15 minutes before the trooper read him his rights. Official Transcript, N. T. at 41. Louis Vecchio testified at the suppression hearing that to the best of his recollection no questioning took place prior to the appellant being given his rights. Official Transcript, N.T. at 6. The lower court's resolution of this conflict of testimony is binding on this court, see *Commonwealth v. Williams*, 226 Pa. Superior Ct. 466, 313 A.2d 773, *allocatur refused*, 226 Pa. Superior Ct. *xxx* (1973). The appellant was immediately given his constitutional rights.

2. The waiver form was introduced into evidence as a Commonwealth exhibit. Troopers Hertig and Martinelli, Bruno Mandarano and Charles Gapen subscribed the form as witnesses. At the bottom right of the form Trooper Hertig wrote "Refused".

3. Official Transcript, N. T. at 19, contains the following cross-examination of Charles Gapen by appellant's counsel:

fied at the suppression hearing that while standing outside of the patrol car he heard Trooper Hertig read the appellant his constitutional rights as well as the waiver paragraph at the bottom of the standard waiver form. He further testified that the appellant said "he understood everything." Official Transcript, N. T. at 28.[4]

"Q. Joe [Cost] came in the car. What happened then?

"A. About the same time, he [Trooper Hertig] have [sic] him [Cost] his constitutional rights. He [Trooper Hertig] read him [Cost] his rights. I believe it was you have a right now to answer anything or something like that.

"Q. You say he read them. Was there a light on in the car?

"A. Yes, he [Trooper Hertig] had the dome light on, and the officer was writing.

"Q. What rights were read to him [Cost]? Did he [Cost] understand them?

"A. He [Trooper Hertig] read them *and Cost said I have been on both sides of the fence and I understand.*" (Emphasis added)

The Official Transcript, N. T. at 23, contains the following direct examination of Bruno Mandarano by the district attorney:

"A. Trooper Hertig asked Joe if he had been at Dominic's that night, and he said, no, and he said, you know you were at Dominic's, and the trooper said I am going to ask you some questions. So, he read him his rights and started to ask him some questions.

"Q. Do you recall what those rights were?

"A. You have a right to keep silent, you don't have to say anything, and I don't recall all the others. He read them all off.

"Q. What was Mr. Cost's condition as far as whether he understood what was going on?

"A. *He said that he's been on both sides of the fence, and he knew what was going on.*" (Emphasis added).

4. On direct examination of Trooper Martinelli by the district attorney:

"Q. I would like to know as far as the rights were concerned, what the sequence was?

"A. He read him his rights signed by myself and Mr. Mandarano, Hertig and Mr. Gapen.

"Q. And Mr. Cost?

"A. He refused to sign it.

According to the testimony of the witnesses, appellant, in response to Trooper Hertig's questions, made a series of contradictory and incriminating statements concerning his involvement in the incident at Mandarano's tavern. The witnesses' estimates of the length of this initial interview vary between twenty minutes to one hour. Following this initial interview, the appellant told the trooper where he would be staying for the night, and, although the record is not absolutely clear on this, it appears that the troopers informed the appellant that they would return to question him further.

The state troopers then proceeded to a magistrate's office and, apparently on the basis of facts gathered in the initial interview, obtained a warrant for appellant's arrest. They then went to appellant's sister's home where appellant had told them he would be staying. At approximately 7:30 A. M. they arrested appellant and read to him his constitutional rights and the arrest warrant. However, they did not seek a waiver of rights from him at this point and, according to Trooper Hertig, they did not attempt to question him. At this point, the record reveals that appellant again made a series of incriminating statements, without any questions being asked of him.

In this appeal, the appellant contends (1) that he cannot be convicted of burglary since Mandarano's tavern was a place held open to the public, and (2) that "statements made by the accused to the police during their investigation" should have been suppressed because the "circumstances of defendant's refusal to sign a waiver of right form, defendant's intoxicated condition and the presence of his accusers, indicate that the defendant did

---

"Q. What was his condition as to intelligently and understandably knowing his rights?

"A. He said he understood everything. *He said he'd been through it before, and he said he was a police officer in Ohio, and he's been on both sides of the fence.*" Official Transcript, N. T. at 27-28. (Emphasis added).

not volunteer such statements or intelligently or knowledgeably waive his right to remain silent." Brief for Appellant at 1.

I

The offense of burglary is defined in 18 Pa.C.S. §3502 as follows:

"(a) Offense defined.—A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, *unless the premises are at the time open to the public or the actor is licensed or privileged to enter."* (Emphasis added).

The charge of the trial judge to the jury on the burglary count was as follows:

"The Court charges you with respect to this crime that it is necessary in this case that the Commonwealth prove that at the time the defendant entered this building, he did so with the intent to commit a crime therein, and under the provisions of that Act exempting the entry into a public building you must make a further determination. *The Court charges you that even though this was a public building in that sense, inviting persons in for business purposes, that when a person comes into that place and does so for the purpose of committing a felony therein, or when a person comes into that place and goes beyond the ordinary bounds of the area provided for its business customers and there commits a crime, or enters therein for the purpose of committing a crime, he is guilty then of the crime of burglary."* Official Transcript, N. T. at 143. (Emphasis added).

Appellant's counsel excepted to this charge and requested the trial judge to " . . . instruct that if the premises were open to the public, and entry into a building was proper, regardless of the intent, this does not constitute a bur-

glary even if there's a crime later committed." Official Transcript, N. T. at 152. The trial judge, noting the exception, refused this request. Official Transcript, N. T. at 152-53.

We must determine whether the clause in §3502(a) of the new Crimes Code, " . . . unless the premises are at the time open to the public . . .", substantively changes the former law of burglary in this Commonwealth, and whether the Commonwealth has the burden of proving, as an element of the offense, that the premises were not open to the public at the time of the entry. We conclude that the Commonwealth, to make out the crime of burglary, must show, as an element of the offense, the fact that the premises were not open to the public at the time of the entry, regardless of the actor's intent at the time of his entry onto the premises. In this light, the trial judge's charge on burglary was clearly erroneous in that it permitted the jury to reach a finding of guilt based solely upon the defendant's intent at the time of entry and ignored the limiting phrase of the statute, " . . . unless the premises are at the time open to the public . . . ." On the basis of the foregoing and following discussion, we reverse appellant's conviction for burglary.[5]

---

5. In view of the erroneous charge to the jury we find it unnecessary to decide whether appellant's entry upon the tavern premises with felonious intent could, as the Commonwealth seems to maintain, constitute an entry into the victim's living quarters which Mandarano maintained on the second floor of the building housing the tavern. Further, we need not decide whether a jury finding that an entry by appellant's accomplice into the area behind the bar in order to take money from a cash register could support a conviction of burglary on the grounds that there was an entry of a " . . . separately secured . . . portion . . . ." of the premises.

Further, we find no support, nor does the Commonwealth cite any authority, to sustain the Commonwealth's suggestion that the "premises open to the public" clause of the new burglary statute should apply only to less serious crimes such as retail theft.

Prior to the enactment of 18 Pa.C.S. §3502, Section 901, of the Penal Code, Act of June 24, 1939, P.L. 872, 18 P.S. §4901, defined the crime of burglary as follows: "Whoever, at any time, wilfully and maliciously, enters *any building,* with intent to commit any felony therein, is guilty of burglary . . . ." (Emphasis added).

In *Commonwealth v. Schultz,* 168 Pa. Superior Ct. 435, 79 A.2d 109, *allocatur refused,* 168 Pa. Superior Ct. *xxiv, cert. denied,* 342 U.S. 842 (1951) a case decided under Section 901 of The Penal Code, Act of June 24, 1939, P.L. 872, 18 P.S. §4901, the defendants contended that they could not " . . . be convicted of burglary because their entry into the taverns was an entry into a business place at the implied invitation of the owners, and not a wilful and malicious entry as defined by the statute." *Commonwealth v. Schultz,* supra at 440, 79 A.2d at 111.

In rejecting the defendants' contention, it was held: "The entry is wilful and malicious, or felonious, within the statute [Act of June 24, 1939, P.L. 872, §901, 18 P.S. §4901], when made with the intent to commit a felony in the building. *The fact that the building entered was a store, tavern, or restaurant, and open to the public, does not prevent the crime from being burglary if the entry is wilful and malicious, that is, made with the intent to commit a felony therein."* *Commonwealth v. Schultz,* supra at 440, 79 A.2d at 111 (emphasis added).[6]

---

6. In *Commonwealth v. Garrett,* 229 Pa. Superior Ct. 459, 323 A.2d 314 (1974), decided under the Act of June 24, 1939, P.L. 872, §901, 18 P.S. §4901 [*Commonwealth v. Garrett,* supra at 461, n.1, 323 A.2d at 314 n.1], we held that " [t]hough a wilful and malicious entry is required, *the entry into a store* [the store in *Commonwealth v. Garrett,* supra, was open to the public at the time of entry] *may be such,* if made with the intent to commit a felony." *Commonwealth v. Garrett,* 229 Pa. Superior Ct. 459, 463, 323 A.2d 314, 316 (1974) (citation omitted) (emphasis added).

Although, *Commonwealth v. McCoy,* 209 Pa. Superior Ct. 399, 228 A.2d 43, *allocatur refused,* 209 Pa. Superior Ct. *xxxix*

We believe that the purpose of the inclusion of the "open to the public" clause in section 3502 of the new Crimes Code was to prevent the prosecution and conviction of burglary in cases such as in the instant appeal, to change the substantive law of burglary as articulated in *Commonwealth v. Schultz*, supra, and to bring the law of burglary closer to its common law ancestor which sought to protect private premises from crime.[7]

---

(1967), was concerned with the definition of "building" as used in the Act of June 24, 1939, P.L. 872, §901, 18 P.S. §4901, there is language in the opinion which is instructive on the development of the offense of burglary in this Commonwealth prior to 18 Pa.C.S. §3502. "The historical development of burglary shows a considerable expansion in the kinds of structures which would qualify as the subject of the crime. At common law, burglary was the night time breaking and entering of the dwelling house of another with intent to commit a felony therein. Sections 135 and 136 of the Act of 1860, March 31, P.L. 382, were significantly broader and included numerous public and private structures. Section 4901 substituted the single category of 'building.' This development and the similar expansion of burglary statutes in other jurisdictions, indicates an increase in legislative concern for the protection of all property within a structure, even though not a dwelling." *Commonwealth v. McCoy*, supra at 402, 228 A.2d at 45 (footnotes omitted).

7. K. JARVIS, *Pennsylvania Crimes Code and Criminal Law*, Ch. 35, §3502, discussion at 2-3 (1974) in discussing section 3502 of the new Crimes Code:

"Probably the biggest change in the law is the fact that one who enters premises open to the public or which he is permitted to enter is not a burglar, as he was under the prior law. Therefore, the shoplifter, now known as the retail thief, can no longer be charged with burglary, since as a member of the public he was permitted to enter the premises.

"This changes the previous line of cases which had gone so far as to hold that the man who broke into a pay telephone booth was guilty of burglary, as was the man who broke into a vending machine in the men's room of a tavern.

"This also gets back to the original definition of burglary, which was the breaking and entry of a home at night time. The idea that it was an uninvited entry into a residence made it a serious offense. Here, again, the law emphasizes that the

The prosecution must prove that the premises were not open to the public at the time of entry. Our holding reversing appellant's conviction for burglary is based upon the error of the trial court in charging that the jury could find appellant guilty of burglary if he merely entered the tavern with felonious intent regardless of whether the tavern was at the time open to the public. This charge was merely a restatement of the law prior to the enactment of the new Crimes Code and rendered the "open to the public" language of section 3502 meaningless.

## II

Appellant contends that "the trial court err[ed] in denying defendant's motion to suppress evidence of statements made by the accused to the police during their investigation when [the] circumstances of [the] defendant's refusal to sign a waiver of right form, defendant's intoxicated condition and the presence of his accusers, indicate that the defendant did not volunteer such statements or intelligently or knowledgeably waive his right to remain silent." Brief for Appellant at 1. After a review of the record, we find that the Commonwealth has carried its " . . . burden of showing by a preponderance of the evidence . . . ." *Commonwealth v. Rhoads*, 225 Pa. Superior Ct. 208, 211, 310 A.2d 406, 408 (1973) (citation omitted), that the appellant's statements were voluntarily made, and consequently the trial court did not err in denying the appellant's motion to suppress.

It is well-established by the decision in *Miranda v. Arizona*, 384 U.S. 436 (1966) that: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right

---

entry of premises to which the public is invited is not a burglary, but entering premises which are private with the intent to commit a crime is a burglary." (Footnote omitted).

to the presence of an attorney, either retained or appointed. *The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id.* at 444.

In determining the voluntariness of the appellant's statements given to the troopers at the time of the initial interrogation " . . . the ultimate test . . . is whether the confession[8] is the product of an essentially free and unconstrained choice by its maker." *Commonwealth v. Hallowell,* 444 Pa. 221, 225, 282 A.2d 327, 329 (1971) (footnote added).

We must review the record and consider the " . . . totality of circumstances, including the accused's mental and physical condition." *Commonwealth v. Hallowell,* supra at 226, 282 A.2d at 329 (1971) (citation omitted). The appellant directs our attention to three "circumstances," the refusal to sign the waiver form, his intoxication, and the presence of his accusers, and argues that these "circumstances" when taken together indicate a failure to voluntarily waive his right to remain silent. While the "totality of circumstances" test will ultimately require us to review the cumulative effect, if any, of all three "circumstances", we will consider separately each of the appellant's three arguments in order to weigh the significance, or lack thereof, of each factor which the appellant claims precludes a finding of a voluntary waiver.

---

8. Instantly, the appellant did not make a confession but he gave a series of contradictory and incriminating statements. The Court in *Miranda v. Arizona,* 384 U.S. 436, 476 (1966) makes it clear that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."

## A

The Commonwealth's evidence on the record clearly sustains a finding that appellant was properly informed of his privilege against self-incrimination and his right to the assistance of counsel prior to questioning at the initial interview. Further, appellant was asked to waive his rights and to indicate that waiver by signing a standard state police waiver form. All witnesses agreed that appellant refused to sign the form. However, appellant, before questioning, indicated that he, in the words of the witnesses, "understood his rights." Appellant was then questioned and made various contradictory and incriminating statements.

The appellant's refusal to sign the waiver form is not *per se* dispositive of the issue of voluntariness. "The rule in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) does not require that a waiver of rights be in writing, but only that it be voluntarily, willingly and intelligently made." *United States v. Stuckey,* 441 F.2d 1104, 1105 (3d Cir.) (per curiam), *cert. denied,* 404 U.S. 841 (1971). Further, we agree with the reasoning of the Seventh Circuit in *United States v. Crisp,*[9] 435 F.2d 354 (7th Cir.), *cert. denied,* 402 U.S. 947 (1971) wherein it was stated that the " . . . form [waiver] supplies evidence of waiver, and a refusal to sign such a form may be a *relevant factor* in determining the validity of an asserted waiver in light of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694." *Id.* at 358 (citation omitted) (emphasis added).

The circumstance of the appellant's refusal to sign the waiver form does not alter our responsibility to re-

9. *United States v. Crisp,* 435 F.2d 354 (7th Cir.), *cert. denied,* 402 U.S. 947 (1971) is cited by Justice Pomeroy in *Commonwealth v. Martin,* .... Pa. ...., ...., 348 A.2d 391, 409 (1975). The significance of *Commonwealth v. Martin,* supra, is discussed in the text following this note.

view the entire record to determine whether the appellant's statements were made voluntarily. This is evidenced by the following language of Justice POMEROY in *Commonwealth v. Martin,* ... Pa. ..., ..., 348 A.2d 391, 409 (1975) :

> "Appellant's first argument for suppression of Michel's [FBI Agent] testimony seems to be that the oral statement should not have been admitted because Martin's refusal to sign the written *Miranda* waiver form is a conclusive indication that his oral waiver was not knowing and intelligent. We do not doubt that in some situations a refusal of a person being questioned to sign a waiver form, even though followed by an apparent willingness to allow further questioning, can be indicative of confusion or ignorance such as to require the police to seek additional assurances of intelligence and understanding before proceeding further. See e.g., *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968); *United States v. Jenkins,* 440 F.2d 574 (7th Cir. 1971). In other situations the absence of a written waiver has not been thought to vitiate oral statements. See *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1971), *cert. denied* 402 U.S. 947, 29 L.Ed.2d 116 (1971); *Hodge v. United States,* 392 F.2d 552 (5th Cir. 1968). See also *Commonwealth v. Canales,* 454 Pa. 422, 311 A.2d 572 (1973).
>
> "The record here satisfies us that Martin was aware of his rights and voluntarily gave the oral statements now challenged."

Similarly, on the basis of the record before us we are satisfied that the appellant was aware of his rights and voluntarily gave the oral statements now challenged. The testimony of the witnesses at the suppression hearing establishes that the appellant said he "understood his rights." See nn. 3, 4 supra. Other than the mere failure to sign the waiver form, the appellant gave no indication that he desired to remain silent. He freely re-

sponded to the questions of Trooper Hertig. Further, aware of his rights, he in no way indicated that he desired the presence of an attorney.[10]

Before concluding this issue we feel that one of the two cases[11] cited by Justice POMEROY in *Commonwealth v. Martin,* supra, *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968) requires review. In *United States v. Nielsen,* supra, the Seventh Circuit found that the defendant's refusal to sign a waiver form compelled a conclusion "... that the defendant's negative responses to the questions asked him were not made after a knowing and intelligent waiver of his rights." *Id.* at 853. *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968) is distinguishable from the instant case.

The precedential value of the decision in *United States v. Nielsen,* supra, is established in *Commonwealth v. Youngblood,* 453 Pa. 225, 307 A.2d 922 (1973): "In concluding that the Commonwealth has not sustained its burden as to voluntariness [statements made to inter-

---

10. The appellant argued at the suppression hearing, and again argues before us that there was no showing that he was advised he was a suspect when the questioning began. There is testimony of the Commonwealth's witnesses at the suppression hearing that the appellant was so advised. The lower court's resolution of this conflict of testimony is binding on this court, *see Commonwealth v. Williams,* 226 Pa. Superior Ct. 466, 313 A.2d 773, *allocatur refused,* 226 Pa. Superior Ct. *xxx* (1973); before the questioning began the appellant was advised that he was a suspect.

11. In *United States v. Jenkins,* 440 F.2d 574 (7th Cir. 1971), the second case cited by Justice POMEROY for the proposition that in some instances a refusal to sign a waiver form will indicate that the subsequent statements are not voluntary, the Seventh Circuit, relying on its holding in *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968), and distinguishing *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1970) [cited by Justice POMEROY in *Commonwealth v. Martin,* ... Pa. ..., ..., 348 A.2d 391, 409 (1975)], concluded that "... the record is devoid of any evidence to show that Jenkins' answers to the agent's questions were in fact voluntary ...." *United States v. Jenkins,* supra at 576.

rogating officer], see Commonwealth v. Nathan, 445 Pa. 470, 477, 285 A.2d 175 (1971), *we adopt the reasoning of the Court of Appeals for the Seventh Circuit,* which held in an analogous situation that '... the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry, we are compelled to conclude that the defendant's ... responses to the questions asked him were not made after a knowing and intelligent waiver of his rights.' United States v. Nielsen, 392 F.2d 849, 853 (7th Cir. 1968). See also United States v. Jenkins, 440 F.2d 574 (7th Cir. 1971)." *Id.* at 233-234, 307 A.2d at 927 (emphasis added).

However, we do not read *United States v. Nielsen,* supra, as establishing a prophylactic rule that a defendant's refusal to sign a waiver form automatically means that the defendant is assuming an ambiguous and contradictory position. The cite from *United States v. Nielsen,* supra, found in *Commonwealth v. Youngblood,* supra, does not reflect the factual context for the holding in *United States v. Nielsen,* supra.

Prior to *United States v. Nielsen,* supra, the Seventh Circuit held in *United States v. Smith,* 379 F.2d 628 (7th Cir. 1967) that:

"... we are of the opinion that in post-*Miranda* cases the *Miranda* rule applies with *greater* force to preclude as unconstitutional the admission of statements resulting from in-custody interrogation *after known retainer or appointment of counsel* and with-

out counsel's presence or approval, unless it very clearly appears that the accused deliberately and understandingly chose to forego the assistance of counsel at such interrogation." *Id.* at 633 (emphasis in original).

*United States v. Nielsen,* supra, involved a situation of "known retainer or appointment of counsel." In *United States v. Nielsen,* supra, the Court stated that:

"The agent further testified that he again warned the defendant of these rights when they reached the F.B.I. office and that the defendant himself read a statement of these rights which were contained in a 'waiver of rights' form. According to the agent, the defendant then said: *'I am not going to sign this document. I have an attorney, . . . and I am not signing anything, including this form,* until I have occasion to talk to Mr. Wolfson.'" *Id.* at 851 (emphasis added) (footnote omitted).

The Court then went on to state that:

"As we recently said in United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967), a case discussing the thrust of the *Miranda* rules, there must be a *clear showing* 'after known retainer . . . of counsel . . . that the accused deliberately and understandingly chose to forego the assistance of counsel at such interrogation.'" *Id.* at 853 (emphasis added).

Instantly, the appellant gave no indication that he had retained counsel or that he desired the presence of counsel.[12] We are not persuaded that *United States v. Nielsen,* supra, is sufficiently analogous to the instant case that the appellant's oral statements should be considered the product of a contradictory position. Our task is to review the entire record in order to resolve the issue of voluntariness.

---

12. In *Commonwealth v. Youngblood,* 453 Pa. 225, 307 A.2d 922 (1973), the defendant had initially elected to remain silent so that his sister could find an *attorney.*

## B

The appellant argues that he was intoxicated at the time of the initial interview. The "totality of circumstances test" requires us to consider both the mental and physical condition of the accused. *Commonwealth v. Hallowell,* supra. At the conclusion of the testimony at the suppression hearing, appellant's counsel did not assert intoxication as a reason in support of his motion to suppress. Official Transcript, N. T. at 36–37. Further, a review of the record fails to uncover any evidence produced by the appellant to show intoxication. We are precluded from considering this issue on appeal. *See Commonwealth v. Williams,* 226 Pa. Superior Ct. 466, 313 A.2d 773, *allocatur refused,* 226 Pa. Superior Ct. *xxx* (1973).

## C

Appellant's final contention is that his statements were made under threatening circumstances, i.e., he was "hemmed in" a patrol car with three adverse witnesses. "[W]hen the question of voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused." *Commonwealth v. Alston,* 456 Pa. 128, 134, 317 A.2d 241, 244 (1974) (citation omitted). After careful review of the record, we are not convinced that the presence of the three adverse witnesses resulted in the appellant's being coerced into giving his oral statements.[13]

We find, therefore, that the appellant's statements at the time of his initial interrogation were voluntarily,

13. In fact, to the extent that the appellant's refusal to sign the waiver form can be characterized as an act of defiance and we believe that it can be characterized as such, this belies any contention that the appellant was questioned under circumstances where he had no other choice but to cooperate with the state trooper.

intelligently and knowingly given to the state trooper, and the trial judge correctly denied the appellant's motion to suppress.[14]

Accordingly, appellant's conviction for burglary is reversed and the judgment of sentence on the robbery conviction is affirmed.

---

CONCURRING AND DISSENTING OPINION BY CERCONE, J.:

While I agree with the majority in reversing appellant's conviction for burglary, I would also reverse his conviction on the robbery charge because of the lower court's admission of the statements appellant made on the night of the crime.

The pertinent facts are as follows: Appellant and a companion were drinking beer and playing pool at Dominic Mandarano's tavern in the afternoon and evening of January 19, 1974. At some time after 9:00 P.M., Mandarano, while sitting at the bar watching television, was struck from behind and knocked to the floor by appellant's companion, a stranger to Mandarano. Appellant

---

14. At the suppression hearing, the appellant's counsel moved to suppress the statements made at the time of the initial interrogation and then summarily moved to suppress all statements made at the time of appellant's arrest: "My only other point is that all later statements made by the defendant, if the first interrogation is faulty, according to the recent Supreme Court decision, all later questions and answers would all be inadmissible . . . ." Official Transcript, N.T. at 37.

On appeal, the text of the appellant's brief addresses only the circumstances surrounding the initial interrogation. The appellant submits no independent argument why the statements made at the time of the arrest are inadmissible. To the extent the appellant's brief can be read to support a challenge to the statements made at the time of the arrest, this challenge can only be founded upon an argument that the statements are inadmissible because they are infected with the illegality of the initial interrogation. We find nothing "faulty" with the initial interrogation.

and his companion were the only two customers remaining in the tavern at this time. Mandarano remained conscious and saw appellant's companion remove $150 to $250 from his pocketbook and another $110 from the cash register located behind the bar. Appellant was not present when his companion struck Mandarano; he had left moments before the assault and did not return.

Louis Vecchio and Charles Gapen, who were in Vecchio's bar across the street from Mandarano's tavern, observed appellant leave and enter the Mandarano tavern several times during the evening. After the attack on the tavern owner, Bruno Mandarano, the victim's son, along with Gapen and Vecchio, accompanied the State Police in their search for appellant and his companion, who were the only suspects at that time. Appellant was located at his stepfather's residence at approximately 2:00 A.M. He was taken to the patrol car and was asked to sit in the front seat where he was questioned by Trooper Michael Hertig of the State Police in the presence of Vecchio, Gapen and Bruno Mandarano who were seated in the back seat of the car. Trooper Hertig immediately read appellant his constitutional rights from the standard State Police waiver form which the Commonwealth introduced into evidence.[1] Trooper Martinelli, while stand-

---

1. "My name is Trooper Michael D. Hertig. I wish to advise you that you have an absolute right to remain silent; that anything you say can and will be used against you in a court of law; that you have a right to talk to an attorney before and have an attorney present with you during questioning, that if you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you do desire. If you decide to answer any questions, you may stop any time you wish.

WAIVER

I fully understand the statement advising me of my rights and I am willing to answer questions. I do not want an attorney and I understand that I may refuse to answer questions any time during the questioning. No promises have been made to me, nor have any threats been made against me.

Signature ........................

ing outside of his patrol car, heard Trooper Hertig read the rights as well as the waiver paragraph at the bottom of the standard waiver form. Although appellant stated that he understood his rights, he refused to sign the waiver form. Although the testimony of the witnesses other than the troopers was somewhat ambiguous and vague concerning the giving of the rights, all were sure that the form was read to the appellant. At the suppression hearing Gapen testified that appellant said, "I have been on both sides of the fence," and also that appellant stated he understood his rights before questioning. At trial, Trooper Hertig was of the opinion that appellant had been drinking shortly before this first confrontation but was not intoxicated. The witnesses' estimates of the length of the initial interview vary between twenty minutes to one hour.

The officers then proceeded to a magistrate's office and, apparently on the basis of facts gathered in this interview, obtained a warrant for appellant's arrest. The troopers then went to appellant's sister's home where appellant had told them he would be staying. At approximately 7:30 A.M. they arrested appellant and read to him his constitutional rights and the arrest warrant. However, they did not seek a waiver of rights from him at that time. At this point it appears that appellant again made a series of incriminating statements.

In addition to this prevailing argument that his burglary conviction violated the relevant provision of the Crimes Code,[2] appellant contends that his incriminating statements to the police officer-witnesses were not given pursuant to a valid waiver of his right to remain silent and that, therefore, his robbery conviction should be reversed.[3] I agree.

---

2. Act of December 6, 1972, P.L. 1482, No. 334, §1, 18 Pa. C.S. §3502 (1973).

3. It is of interest that, outside of appellant's statements to the investigating officers, there is little evidence connecting him

It is clear that a person under custodial interrogation who has been properly informed of his privilege against self-incrimination and his right to counsel may elect to waive these constitutional rights and permit questioning without counsel. However, any waiver must be knowingly, intelligently and voluntarily given. *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) ; *Commonwealth v. Purvis,* 458 Pa. 359, 326 A.2d 369 (1974); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974); *Commonwealth v. Simms,* 455 Pa. 599, 317 A.2d 265 (1974); *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973). In determining voluntariness the totality of the circumstances, including the defendant's physical and mental state, must be considered. *Commonwealth v. Hallowell,* 444 Pa. 221 (1971). The waiver must be the product of the defendant's free and uncoerced discretion. The duration and the methods of interrogation, the conditions of detention, the attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to coercion and undermine self-determination—all must be considered in deciding whether the defendant has waived his right to silence. *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892, 894-95 (1975). The burden to prove a valid waiver by a preponderance of the evidence is upon the Commonwealth. *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972). In *Miranda v. Arizona,* the Supreme Court said: "An express statement that the

---

to the crime. Aside from the appellant's statement, it could be determined only that he was present at the scene of the crime, but not at the time of the robbery; that he had arrived with the person who struck the victim Mandarano and was the actor's companion; and that appellant left the tavern a few moments before the victim was struck and robbed. A strong suspicion of guilt is not sufficient to support a conviction. *Commonwealth v. Herman,* 227 Pa. Superior Ct. 326 (1974). *Commonwealth v. Wilson,* 225 Pa. Superior Ct. 513 (1973).

individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U.S. at 475.

In the instant case all witnesses agreed that on the first occasion appellant refused to sign the waiver of rights form but indicated that he "understood his rights." Appellant was then questioned and made various contradictory and incriminating statements.

In *Commonwealth v. Youngblood*, 453 Pa. 225 (1973), our Supreme Court, in a similar case in which a defendant had refused to sign a waiver of rights form but had then proceeded to answer police questions stated:

"In concluding that the Commonwealth has not sustained its burden as to voluntariness, see *Commonwealth v. Nathan*, 445 Pa. 470, 477, 285 A.2d 175 (1971), *we adopt* the reasoning of the Court of Appeals for the Seventh Circuit, which held in an analogous situation that '. . . the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry we are compelled to conclude that the defendant's . . . responses to the questions asked him were not made after a knowing and intelligent waiver of his rights.' *United States v. Nielsen*, 392 F.2d 849, 853 (7th Cir. 1968). See also *United States v. Jenkins*, 440 F.2d 574 (7th Cir. 1971).

"Our position today is not inconsistent with prior decisions of this Court. In three recent cases we have held that a defendant's initial exercise of *Miranda* rights did not foreclose a later waiver. In each instance, however, the waiver was preceded by a complete reexplanation of those rights, conspicuously absent in this case. *Commonwealth v. Grandison,* 449 Pa. 231, 296 A.2d 730 (1972); *Commonwealth v. Jefferson,* 445 Pa. 1, 281 A.2d 852 (1971); *Commonwealth v. Franklin,* 438 Pa. 411, 265 A.2d 361 (1970)." (Emphasis added.) 453 Pa. at 233-234.

The Commonwealth bears a "heavy burden" to prove that the accused understood his rights. *Commonwealth v. Goldsmith,* 438 Pa. 83 (1970). In the instant case, may the statement by appellant that he understood his rights combined with his responses to questioning be taken together to show a valid waiver where appellant also refused to sign a proffered waiver form? I think not. This case is illustrative of a similarly ambiguous and contradictory position taken by the accused in the *Nielsen* and *Youngblood* cases.[4] Here, as in those two cases, there is no evidence in the record of an express statement by the appellant that although he "understood" his rights, he chose to waive them. Without a further determination by the interrogating officers that appellant waived as well as understood his rights, the reason for his refusal to sign the waiver, combined with responses to questioning, remained unclear. There is no evidence on the record that the officers attempted to clear up the ambiguity or attempted to explain to appellant that his

---

4. In *Nielsen,* supra, a suspect after being advised of his rights declined to sign a waiver of rights form. However, he then refused an offer to call his attorney, saying "it could wait til later on in the morning" and then told the F.B.I. agents that they could "proceed with the questioning." The court held that the government had not established a waiver. See also *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1970) and *United States v. Stuckey,* 441 F.2d 1104 (3d Cir. 1971).

refusal to sign the waiver did not of itself preclude the use of his statements against him. Contrary to an interpretation of implied waiver, the evidence is equally susceptible to an inference that the appellant thought that nothing he said could be used against him as long as he chose not to sign the waiver form. This appears to be precisely the kind of situation envisioned by our Supreme Court in *Youngblood,* supra, in which an accused's contradictory position remained unclarified on the record, thereby precluding any finding of a knowing, intelligent and voluntary waiver of *Miranda* rights. *Commonwealth v. Goldsmith,* supra, 438 Pa. at p. 86.

This situation is distinguishable from that in *Commonwealth v. Canales,* 454 Pa. 422 (1973) in which an accused gave an oral statement to a police officer, insisting that nothing be written down. There appellant contended that this should have alerted the police to the fact that he was not waiving his rights knowingly, intelligently or voluntarily. However, in *Canales* the accused said to the interrogating officer, "it will be your word against mine," giving rise to an inference that the accused was aware that his oral statements could be used against him in court and, that he felt that he could prevail in a credibility contest against the police officer. Canales' statements were held admissible because the court concluded that the waiver was knowing and intelligent. In the instant case, we hold that the facts surrounding this initial interrogation of appellant fail to support a valid waiver of his *Miranda* rights.[5]

---

5. *Commonwealth v. Martin,* .... Pa. .... (1975), upon which the majority herein relies in affirming the lower court's decision to allow appellant's statements into evidence, was only a plurality opinion (Justices ROBERTS, NIX and MANDERINO concurred in the result, and Justice EAGEN dissented). Therefore, its precedential value is suspect. Furthermore, the plurality opinion stated that questions of voluntariness turn on the facts of the particular cases, and that the record in *Martin* satisfied the plurality that "Martin was aware of his rights and voluntarily gave

We conclude that *all* statements made to the investigating officers, including those made at the time of appellant's arrest only a few hours after the initial interrogation, were inadmissible against him because of the infirmities of the initial interrogation. At the time of his arrest appellant was again advised of his *Miranda* rights. However, he was not at that time requested to execute a waiver of those rights. Apparently appellant then made several unsolicited and incriminating statements. Although volunteered statements are not barred by the Fifth Amendment, and the police need not stop and warn those who make statements not elicited by questioning, *Miranda v. Arizona*, supra, 384 U.S. at 478; *Commonwealth v. Davis*, 462 Pa. 27, 336 A.2d 888 (1975), I do not feel that this is such a situation. I view the second confrontation as part and parcel of the first interrogation since there existed a direct relationship between the two confrontations, separated as they were by only a few hours during which appellant was sleeping. In fact, during the first interview the investigating officers made it clear to appellant that they would probably be returning to continue questioning him first thing in the morning. It is quite likely that appellant again concluded that nothing he said could be used against him because of his previous refusal to sign the waiver form.

In *Betrand Appeal*, 451 Pa. 381, 388 (1973), our Supreme Court enunciated the test for determining whether a subsequent statement is "tainted" by an initial illegality by the authorities. In *Betrand*, the court said:

> "The seminal case on this issue is *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), where the Supreme Court announced that the relevant test is: '... whether granting establishment of the primary

the oral statements now challenged." ....Pa. at ..... Martin, of course, was not questioned in a police car at 2:00 A.M. while confronting three of his accusers, including the son of the victim.

illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'...

"The Supreme Court also noted that the challenged evidence may be purged of the primary taint only (1) if it results from 'an intervening independent act of a free will,' *Wong Sun,* supra at 486 .... or (2) if the connection between the arrest and the evidence has 'become so attenuated as to dissipate the taint.' " 451 Pa. at 388-389.

In *Commonwealth ex rel. Craig v. Maroney,* 348 F.2d 22, 29 (3d Cir. 1965), cert. denied, 384 U.S. 1019 (1966), the Third Circuit noted two factors of major significance in determining the relationship between an illegal custodial act and subsequent statements: (a) The proximity of the illegal custodial act to the statements; and, (b) The intervention of unrelated circumstances subsequent to the arrest that provide a cause so unrelated to the original illegality that the statement may not be said to be directly related to or derived from the illegality.

Here, appellant's statements at the time of his arrest followed the initial custodial questioning by only a few hours. Further, there were no "unrelated circumstances" subsequent to the initial illegal custodial act to purge the unsolicited statements of the initial taint. In view of our determination that there was a direct causal connection between the initial custodial interrogation and appellant's later unsolicited statements, we hold that the entire process was tainted by the failure of the police to determine whether appellant knowingly, intelligently and voluntarily waived his *Miranda* rights.

Accordingly, appellant's convictions for burglary and robbery should be reversed.

HOFFMAN and SPAETH, JJ., join in this concurring and dissenting opinion.